Filed 3/13/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| RYAN ATKINS et al.,<br><br>    Plaintiffs and Respondents<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Appellant. | B257890<br><br>(Los Angeles County<br>Super. Ct. No. BC449616)<br><br>**ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |


The opinion filed February 14, 2017 and certified for publication is modified as follows:


1.  On page 63, in the first sentence of the first paragraph the word "ever" is deleted, and the words "until retirement" are inserted after Department before the end of the sentence.


As modified, the sentence reads:


Although Smith opined on the value of the plaintiffs' future economic damages, she provided or cited to no testimony, other evidence, or opinion on

1

the likelihood that the plaintiffs would receive future earnings from the Department until retirement.

2.  On page 66, the entire first paragraph including footnote 18 is deleted and replaced with the following two paragraphs:

"An expert's opinion is only as good as the facts on which it is built." (*Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 253.)  Here, there were no facts on which to build Smith's opinion that the plaintiffs were entitled to recover future economic damages to retirement.  Even giving deference to the trial court's ruling denying the City's motion for a new trial and drawing all inferences in favor of it, the evidence is too speculative to lend support to the award of the plaintiffs' future lost earnings until retirement.  (See *Toscano, supra*, 124 Cal.App.4th at pp. 695-696.)

The City does not genuinely dispute that the plaintiffs are entitled to a reasonable, non-speculative award of future economic damages.  The City's argument is that (assuming liability) the plaintiffs are not entitled to recover future lost earnings until retirement, not that they are not entitled to recover any future lost earnings at all.  Although there is evidence in the record from which the jury could have calculated a reasonable amount of future economic damages, it is not our role to say what that amount should be.  "'The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier

of fact.'" (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533; see also *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 696 [remanding for a new trial limited to the amount of punitive damages because the Court of Appeal would not "substitute [its] own assessment of the appropriate amount of punitive damages for that of a jury (or a judge on a new trial motion)"]. We therefore reverse the trial court's award of future economic damages and remand for a new trial on this limited issue. (See Code Civ. Proc., § 657, subd. (5); cf. *Piscitelli, supra,* 87 Cal.App.4th at p. 990 [reversing the judgment without granting a new trial on damages because the reviewing court could distinguish between the reasonable and unreasonable portions of the jury's award for future economic damages].)

This order does not change the judgment. The City's petition for rehearing is denied.

PERLUSS, P. J.        SEGAL, J.        KEENY, J. (Assigned)

3

Filed 2/14/17 (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| RYAN ATKINS et al., | B257890 |
| Plaintiffs and Respondents | (Los Angeles County Super. Ct. No. BC449616) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |


APPEAL from a judgment and postjudgment order of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Affirmed in part, reversed in part, and remanded.

Michael N. Feuer, City Attorney, James P. Clark, Chief Deputy City Attorney, Thomas Peters, Chief Assistant City Attorney, Amy Jo Field, Assistant City Attorney, Blithe S. Bock and Paul Winnemore, Deputy City Attorneys, for Defendant and Appellant.

Jones & Mayer, Martin J. Mayer and Denise Rocawich for California Police Chiefs' Association, California State Sheriffs'

Association and California Peace Officers' Association as Amici Curiae on behalf of Defendant and Appellant.

Greines, Martin, Stein & Richland, Timothy T. Coates and Alison M. Turner for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

McNicholas & McNicholas, Matthew S. McNicholas, Douglas D. Winter; Fullerton & Hanna, Lawrence J. Hanna; Esner, Chang & Boyer and Stuart B. Esner for Plaintiffs and Respondents.

---

## INTRODUCTION

A jury found that the City of Los Angeles violated the rights of five recruit officers of the Los Angeles Police Department under the Fair Employment and Housing Act (FEHA) when the Department terminated or constructively discharged them from the Police Academy. Each of the recruits suffered temporary injuries while training at the Academy. At the time they were injured, the Department had been assigning injured recruits to light-duty administrative positions indefinitely until their injuries healed or they became permanently disabled. The Department ended this practice while the plaintiffs were still recuperating from their injuries. Rather than allowing them to remain in their light-duty assignments, the Department asked them to resign or the Department would terminate them, unless they could get immediate medical clearance to return to the Academy. None of the recruits was able to obtain the necessary

2

clearance, and the Department terminated or constructively discharged all of them. The five recruit officers brought this action.

The jury found that the City unlawfully discriminated against the plaintiffs based on their physical disabilities, failed to provide them reasonable accommodations, and failed to engage in the interactive process required by FEHA. The City challenges the jury's verdict on a number of grounds, including that the plaintiffs were not "qualified individuals" under FEHA because they could not perform the essential duties of a police recruit with or without a reasonable accommodation, and that the City was not required to accommodate the plaintiffs by making their temporary light-duty positions permanent or by transferring them to another job with the City. With respect to the plaintiffs' claim for failure to engage in the interactive process, the City argues that because there were no open positions available for the plaintiffs, the City did not have to continue the required interactive process.

We agree that the plaintiffs were not "qualified individuals" under FEHA for purposes of their discrimination claim but conclude that they satisfied this requirement for their failure to accommodate claim. We further conclude that requiring the City to assign temporarily injured recruit officers to light-duty administrative assignments was not unreasonable as a matter of law in light of the City's past policy and practice of doing so. Because we affirm the City's liability on this basis, we do not reach the City's challenge to the verdict on the plaintiffs' claim for failure to engage in the interactive process.

The City also challenges the jury's award of future economic damages as speculative and excessive. Despite the fact

3

that the plaintiffs had completed only hours or weeks of their Academy training, the jury awarded each of them future economic losses through the time of their hypothetical retirements from the Department as veteran police officers. We agree with the City that such damages are unreasonably speculative. We therefore vacate that portion of the damages award, as well as, for now, the trial court's award of attorneys' fees and costs.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Plaintiffs and Their Injuries*

The City hired Ryan Atkins, Douglas Boss, Justin Desmond, Anthony Lee, and Eriberto Orea as recruit police officers between mid-2008 and early 2009. Each of them entered the Police Academy shortly after he was hired. Upon successful completion of the Academy's six-month training course, the recruits would have started a 12-month field probationary period as police officers.

Atkins trained in the Academy for three months before suffering a knee injury that eventually required surgery. Boss fractured his ankle two weeks into training. Desmond suffered an injury while running on the third day of Academy training, received medical attention, and eventually joined another recruit class before injuring his groin and back five or six weeks later. Lee started Academy training in July 2008, resigned a month later for personal reasons, then joined another recruit class in December 2008. A week later he injured his knee and underwent knee surgery in mid-2009. Orea injured his knee on his third day at the Academy.

4

All of the plaintiffs saw City doctors who restricted their activities in various ways. The City provided physical therapy for some of the plaintiffs and placed all of them in the "Recycle" program, which gave the plaintiffs desk jobs while they recuperated.

B.    *The Recycle Program and Its Demise*

According to the Recruit Officer's Manuals dated September 2007 and May 2009, which the court received into evidence, recruit officers had to pass a physical fitness examination that included a mile-and-a-half run and an obstacle course. Recruits who could not pass this examination were "recommended for termination from the Department." When the plaintiffs joined the Academy, they signed a Physical Condition Disclosure Form stating that they were "physically qualified and have no pre-existing physical limitations that would prohibit [them] from fully participating in all aspects of the Academy recruit physical conditioning and self-defense training program."

If a recruit became injured while at the Academy, the City placed him or her in the Recycle program, which provided recruits with light-duty administrative jobs until their injuries healed and they could return (or recycle back) to the Academy. While in the Recycle program, recruits received full compensation and benefits.

Before the plaintiffs suffered their injuries, some recruits had remained in the Recycle program until their injuries healed or they became permanently disabled. This practice conflicted with Penal Code section 832.4 and regulations issued by the California Commission on Peace Officer Standards and Training (POST), the agency that oversees police officer training

5

statewide. Those provisions require recruits to complete their training and 12-month probationary period within two years. (See Pen. Code § 832.4; Cal. Code Regs., tit. 11, § 1012.) The Department referred to this requirement as the "two-year rule."

In an apparent attempt to ensure compliance with the two-year rule, the Department adopted the Revised Recruit Officer Recycle Policy in July 2008. That policy stated: "Once in the Recycle Program, the recruit officer will have a total of **90-days** to return to full-duty status and/or re-enter an academy class." If the recruit remained injured at the end of this 90-day period, however, the Department would seek a 90-day extension from POST up to a maximum of six additional months for the recruit to complete his or her Academy training. "In summary," the Policy stated, "any recruit officer with a work restriction(s) or any other condition that precludes them from fully participating in *all* aspects of the Basic Course, *which has or will extend beyond six calendar months, is no longer eligible to remain in the POST Basic Course*." The Department required new recruits, including the plaintiffs, to sign a document acknowledging they had received the Revised Recruit Officer Recycle Policy.

The Department also attempted to avoid violating the two-year rule by changing the date on which recruit officers were sworn into the Department. According to POST and Department practice, the two-year rule did not begin to run until a recruit swore an oath to uphold the Constitution and to protect the residents of Los Angeles.[1] Thus, rather than swearing in new

---

[1]    Penal Code section 832.4 and the corresponding POST regulation that references that code section require recruits to complete their training within 24 months "after his or her employment." (Pen. Code § 832.4, subd. (b); Cal. Code Regs.,

6

recruits on their first day at the Academy, the Department sought to delay the swearing-in date until graduation from the Academy. This change apparently required the agreement of the Los Angeles Police Protective League, the union that represents City police officers. Following a lengthy meet-and-confer process with the Police Protective League, the Department and the Police Protective League signed a Memorandum of Understanding dated November 5, 2008 stating in part: "The Department shall not be required to administer the loyalty oath required by state law and municipal ordinance to recruit officers on the first day of employment. The actual timing and procedure for the swearing in of recruit officers shall be at the discretion of the Department."

The record does not reflect whether the plaintiffs were sworn in before their separations from the Department. It is undisputed, however, that all of the plaintiffs and other injured recruits remained in the Recycle program longer than six months, notwithstanding the Revised Recruit Officer Recycle Policy.

Also in November 2008, Los Angeles Mayor Antonio Villaraigosa sent all City departments a memorandum asking them to reduce their operating budgets, including by reducing the number of City employees, in light of the "extraordinary financial challenges" then facing the City. The Mayor's memorandum also announced a "hard hiring freeze." By March 2009, the City Council recognized that, despite the City's efforts to reduce spending, its fiscal health continued to deteriorate.

---

tit. 11, § 1012, subd. (b).) POST, the Department, and the Los Angeles Police Protective League apparently interpreted the phrase "after his or her employment" to mean after the date on which the recruit is sworn.

7

Perhaps in response to the City's economic difficulties, a Department management team decided in September 2009 to enforce the six-month limit on assignments to the Recycle program by informing recruits who had been in the program longer than six months that they either had to return to the Academy or be discharged from the Department. The Officer in Charge of the Department's Training Division, Lieutenant Edgar Palmer, acknowledged that this decision represented "a significant and unprecedented change" in Department policy. He explained, however, that keeping recruits in the Recycle program longer than six months could compromise the Department's public safety mission and exacerbate its budgetary concerns because, for every recruit in the Recycle program, "that's [another] position[] that you can't hire someone else into. And the idea is to get the recruits into the Academy, get them through the six months [of Academy training] and get them out on the street where they can help public safety." In 2012 the Department ended the Recycle program entirely.

C.      *City Charter Section 1014 Transfers*

If a recruit did not recover from his or her injuries and a doctor declared the recruit's disability "permanent and stationary," the City sometimes placed the recruit in another City job inside or outside the Department. The City made these transfers through section 1014 of the Los Angeles Charter and Administrative Code (City Charter section 1014). City Charter section 1014, subdivision (a), allows the City to transfer a "civil service employee" to another position where the employee is "incapable of performing satisfactorily the duties of his or her position because of injury, sickness or disability." City Charter

section 1014, subdivision (b), provides that such transfers are prohibited "if it would result in a promotion" and "unless the employee possesses the minimum qualifications required for the [new position] and the capability of performing the required duties." Between 2008 and 2010, the Department transferred six recruits into other City positions under City Charter section 1014. The record does not indicate whether these recruits had temporary injuries or were permanently disabled.

   D.   *The Plaintiffs' Assignments to the Recycle Program and Their Separations from the Department*

    1.   *Ryan Atkins*

Atkins first entered the Recycle program in December 2008. He worked in two training center offices where he made copies, delivered papers, filed documents, and entered data. In February 2009 Atkins underwent surgery on his knee and then spent over three months at home recuperating. Atkins returned to the Recycle program in June 2009 and worked in the Tactics Division where he entered data, filed documents, and set up obstacles at a shooting range.

On September 20, 2009 Atkins was summoned to a meeting with Lieutenant Palmer, Sergeant Irma Krish, who worked in the Training Division with Palmer, and a representative from the Police Protective League. Atkins said he suspected the Department was going to fire him because he was asked to bring with him any Department-issued equipment and because he knew of other recruits in the Recycle program whom the Department had laid off or terminated. Some of those recruits had told Atkins about City Charter section 1014 transfers, so

9

during the meeting with Lieutenant Palmer, Atkins asked him whether a transfer was possible. Atkins said Lieutenant Palmer told him that City Charter section 1014 did not apply to his situation.

Lieutenant Palmer then asked Atkins if he thought he could return to the Academy, and Atkins said he thought he could. Lieutenant Palmer told Atkins that if his doctor cleared him to return to the Academy the Department would reinstate him that day; otherwise he would have to resign or the Department would terminate him.

Atkins met with his doctor the same day. He had hurt his knee during week 18 of the training program and believed he could return at roughly the same point in the program because other recruits had told him that had been their experience. Atkins therefore asked his doctor to clear him to return to week 19 of the program, a point at which, according to Atkins, the training curriculum and activities were less strenuous. Upon receiving that medical clearance, Atkins returned to Lieutenant Palmer's office and was told to wait for Captain Michelle Veenstra, the commanding officer of the Department's Training Division. Some time later Sergeant Krish told Atkins she had spoken with Captain Veenstra, who said that Atkins would have to start over from the first week of the Academy because he had been out for so long. Rather than accept this proposal, Atkins resigned.

Atkins later explained that he resigned so that his employment record would not reflect he had been terminated. He also explained that going back to the first week of the Academy would have exacerbated his knee injury. He acknowledged that the Department said it would rehire him (and presumably start

10

his training at week one) when he had completely recovered from his injuries. Eventually Atkins did fully recover, but he did not return to the Department.

### 2. *Douglas Boss*

Boss first entered the Recycle program in March 2009. He worked in a drill instructor's office and a training center office where he processed travel authority documents, entered data, and processed and audited time sheets. By June 2009, when Boss had not fully recovered from his ankle injury, he became concerned that he might "run out of time" to complete the Academy training program. Captain Veenstra suggested that he meet with a Department psychologist to discuss his concerns. Boss said the psychologist told him in late June or early July that Captain Veenstra said that Boss's "job" was "to heal" and that, "whenever that time is, he will go back into an Academy class." The commander of the training division at the training center office where Boss worked reiterated Captain Veenstra's message. He said, "Just heal, don't worry about anything else," and he told Boss that he would "see to it that [Boss] go[es] back into an Academy class once [he's] healed."

On September 18, 2009 Sergeant Krish called Boss, told him to meet with Lieutenant Palmer on September 24, and said to bring his Department-issued equipment. On that day Sergeant Krish met Boss outside Lieutenant Palmer's office and told him, "Just so you know, Boss, you're to resign today or you're going to be terminated. And if we terminate you, you will never work in law enforcement again, anywhere." Once inside Lieutenant Palmer's office, Lieutenant Palmer told Boss that he had been in the Recycle program for seven months, which

11

"exceeded [his] time limit." Lieutenant Palmer said, "you either resign or I fire you." Boss explained to Lieutenant Palmer that he could not resign because he would not qualify for unemployment benefits, which he needed for his medical expenses. Boss said Lieutenant Palmer then told Sergeant Krish to "put [Boss] at home pending termination." Boss asked if there were any other jobs he could do, but Lieutenant Palmer said, "There's no City jobs for you." On November 24, 2009 Boss met with Captain Veenstra, who presented him with termination papers.

Boss received medical clearance to return to all physical activity in the spring of 2010. He did not reapply to the Department because Lieutenant Palmer had told him, "If we fire you, you can't come back here."

3. *Justin Desmond*

Desmond first entered the Recycle program in November 2008 after injuring his leg on his third day at the Academy. About two months later he returned to the Academy but suffered another injury and reentered the Recycle program. Desmond worked in the Scientific Investigation Division where he entered fingerprint information into a computer system. He also worked at the POST Division and the drill instructor's office where he entered data, answered phones, and did some filing.

Desmond said that Justin Fein, who supervised the recruits assigned to the Recycle program at the time Desmond entered the program, told Desmond that his "primary function" while in the program was "to get healthy and to get better." Fein also told Desmond that if he did not recover he would "end up getting 1014 just like [Fein did]." Fein explained to Desmond that a "1014"

happened "when you got hurt with the Department and you ran out of time in the Academy.  [T]hey would transfer you to a position that wouldn't violate your [medical] restrictions. . . .  Once you got healthy you would have the option to come back to the Academy."  After Sergeant Krish took over the Recycle program, Desmond said she told a group of recruits that their "time was ticking and that if we didn't get healed soon we would be forced to resign."

In early 2010 Desmond said Sergeant Krish told him that the Department would ask him to resign or, if he refused, terminate him.  In February 2010, while home recuperating from surgery to repair his groin injury, Sergeant Krish called Desmond and asked if he was ready to resign.  When Desmond refused, he said Sergeant Krish told him that "if I wanted to play hardball, she would see to it that I never got a job in the City or law enforcement" again.  In March 2010 Desmond again told Sergeant Krish that he would not resign, and the Department officially terminated his employment on March 24, 2010.

Eventually Desmond said several doctors cleared him to return to work, and in 2012 he and the Department entered into an oral agreement that allowed him to return to the Academy. Desmond, however, never returned to the Academy.

4.      *Anthony Lee*

Lee entered the Recycle program in December 2008.  He worked in the offices of the Recycle program and a captain's office where he made copies, filed papers, delivered mail, and entered data.  Lee said Fein told him his "job was to get better," and "once you get better, you will . . . get back into an Academy class."  Lee

13

said Fein also told him that if he did not get better he would be "civilianized," meaning he would get another job with the City.

In July 2009 Lee had surgery on his knee, and in September 2009 he was in a car accident that injured his shoulder, neck, wrists, and back. The record suggests Lee continued to work in the Recycle program while recuperating from his surgery and his new injuries. After Lee had been in the program more than six months, he said a sergeant who supervised the drill instructors at the time told a group of recruits that they had only six months to recuperate in the program. Lee became concerned that he would lose his job.

In September 2009 Sergeant Krish ordered Lee to attend a meeting with Lieutenant Palmer and asked him to bring his Department-issued equipment. At the meeting Lieutenant Palmer told Lee that if he resigned Palmer would recommend that the Department rehire him when he recovered. Lee told Lieutenant Palmer he did not want to resign. In response, Lieutenant Palmer said, "Okay, then you'll be terminated . . . [and] you won't be able to come back to [the Department] ever again, and you won't be able to get into any other law enforcement agency." On November 24, 2009 Lee met with Captain Veenstra who formally discharged him. In or about 2013 Lee fully recovered from his injuries.

5. *Eriberto Orea*

Orea entered the Recycle program in approximately September 2008. At that time, an officer told him that if he could not return to the Academy he could "civilianize" through a "program called 1014." When Orea reported for duty to the program, Fein asked him about his education and work

14

experience and assigned him to work in the POST office where he filed documents, made phone calls, and updated computer files. Orea said that the position violated his medical restrictions because he had to park a long distance from the office, walk down a hill to get there, and walk up five flights of stairs to get into the building and office. Upon informing Fein of these concerns, Orea said Fein told him, "Too bad, that's your assignment." Orea's doctor eventually removed his work authorization, and the Department assigned Orea to his home.

Orea had surgery on his knee in February 2009 and stayed home to recover for several months. In June 2009 Fein called Orea and told him he was being reassigned to "Personnel" under Donna Baylosis. Orea thought that meant he would be transferred under City Charter section 1014 because Fein and others had told Orea that if he did not recover from his injury the City would find him another job. Baylosis called Orea and asked him about his education and work experience, and then she called him on a weekly basis to discuss his ongoing medical treatment. Baylosis also told Orea about the "1014 program," which Orea said Baylosis described as a program for recruits who are injured and "don't recover." Based on Orea's qualifications, Baylosis stated that the City would determine whether there were jobs with comparable pay and status that he could fill.

In September 2009 Baylosis told Orea he would have a meeting with Sergeant Krish and Lieutenant Palmer on September 23, 2009. Baylosis and Sergeant Krish separately told Orea to plead his case at that meeting and to ask Lieutenant Palmer to allow him to return to the Academy or to "civilianize." At the meeting, Lieutenant Palmer told Orea he had only two options, resign or be terminated. Orea said he was "under the

15

impression [he] had the possibility of remaining as an injured Recycle until [he] fully recovered or to civilianize, and once [he] was better to go back to the Academy." When Orea asked Lieutenant Palmer if he could "do the 1014 and civilianize," Lieutenant Palmer said, "We're not doing that for you." Orea also offered to go into the next Academy class pending the results of an MRI on his knee. Orea said Lieutenant Palmer responded, "If you resign like you should, I'll write some good notes on your file so you can be rehired; otherwise, I'll make it impossible for you to join [the Department] or any other department." Orea did not resign.

Orea called Baylosis to tell her how the meeting went with Lieutenant Palmer and Sergeant Krish. Baylosis then sent Orea an email with a link to City job postings that differed from what the general public could access. She also told Orea she thought there would be a job posting for a Forensic Print Specialist in the coming months and asked him to keep in touch and let her know if he had any questions. The email she sent him also included a link to information about upcoming civil service examinations. Orea said he looked at the email Baylosis sent him and thanked her for the information. Orea did not say whether he ever investigated any of the job openings listed on the website identified in Baylosis's email or the possibility of taking a civil service exam.

On November 24, 2009 Orea met with Captain Veenstra and a representative of the Police Protective League. Orea said he started to tell Captain Veenstra about the progress he had made in his recovery, but she told him there was nothing she could do and she officially discharged him. She did tell him that he could return to the Academy after he fully recuperated, but

16

based on his earlier meeting with Lieutenant Palmer (who reported to Captain Veenstra), Orea did not believe he could return to the Department. Eventually Orea fully recovered from his injuries.

E.     *The Lawsuit*

On November 16, 2010 the plaintiffs sued the City and Police Chief Charlie Beck. The operative second amended complaint alleged six causes of action, including unlawful discharge from a training program based on physical disability, mental disability, or medical condition in violation of FEHA; failure to accommodate based on physical disability, mental disability or medical condition in violation of FEHA; and failure to engage in the interactive process based on physical disability, mental disability or medical condition in violation of FEHA.[2] The plaintiffs eventually dismissed Beck with prejudice.

Trial began April 21, 2014. At the close of the plaintiffs' case, the City brought a motion for nonsuit on the ground that the plaintiffs were conditional employees whose sole job was to pass the Academy, who admittedly could not do so at the time they separated from the Department, and who were not entitled to a reasonable accommodation under FEHA. The City argued in the alternative that it had accommodated the plaintiffs through the Recycle program and by offering them the opportunity to resign and return to the Academy when they had fully recuperated. Finally, the City argued that it fulfilled its duty to engage in the interactive process because that process "was

_____

[2]     The plaintiffs did not proceed at trial on the other three causes of action.

17

ongoing" from the time the plaintiffs suffered their injuries through their assignments to the Recycle program.[3]

The trial court denied the motion to allow the jury to determine whether the City unlawfully denied the plaintiffs the same benefits that other recruits had received in the Recycle program and under City Charter section 1014. With respect to the plaintiffs' claim for failure to engage in the interactive process, the court said the scope of actions the City should or could have taken was a factual issue for the jury. "[R]ecognizing it's a close call," the court denied the City's motion.

The jury ultimately found in favor of the plaintiffs on all three causes of action and awarded each plaintiff past and future economic and noneconomic losses. In total, the jury awarded the plaintiffs over $12 million. The court entered judgment on the jury's verdict on May 21, 2014.

F.     *Posttrial Motions, Attorneys' Fees, and the Appeal*

The City moved for a new trial and for judgment notwithstanding the verdict, both of which the trial court denied. The plaintiffs then filed a motion for attorneys' fees and costs. On September 29, 2014 the trial court granted their motion and awarded plaintiffs reasonable attorneys' fees in the total amount of $1,632,110. The City timely appealed from the judgment entered in favor of plaintiffs following the jury trial and from the trial court's order denying the City's motion for judgment notwithstanding the verdict. The City also timely appealed from

---

[3]     The City also argued that no evidence supported Atkins's claim that the City constructively discharged him because he voluntarily resigned. The City does not appeal the trial court's adverse ruling on this ground.

the trial court's order granting attorneys' fees and costs to plaintiffs. We consolidated the City's appeals.

## DISCUSSION

"FEHA prohibits several employment practices relating to physical disabilities. First, it prohibits employers from refusing to hire, discharging, or otherwise discriminating against employees because of their physical disabilities. [Citation.] Second, it prohibits employers from failing to make reasonable accommodation for the known physical disabilities of employees. [Citation.] Third, it prohibits them from failing to engage in a timely and good faith interactive process with employees to determine effective reasonable accommodations." (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 371; see *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 970.) "Separate causes of action exist for each of these unlawful practices." (*Nealy*, at p. 371; see *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987.)

The City challenges all three of the bases for its liability under FEHA. With regard to the plaintiffs' discrimination claim, the City argues that the plaintiffs failed to show a prima facie case of discrimination because they could not perform the essential functions of a police recruit even with reasonable accommodations. In connection with the plaintiffs' claim for failing to make reasonable accommodations, the City argues that FEHA does not entitle what the City calls "pre-probationary trainees" like the plaintiffs to reasonable accommodations, and, even if it did, the plaintiffs failed to show that there was a reasonable accommodation available for them. According to the City, this failure also dooms the plaintiffs' claim for failure to

19

engage in the interactive process.  Finally, the City challenges the award of damages as "astonishing" and the award of attorneys' fees as excessive.

>   A.    *Standard of Review*

The standard of review on appeal from a trial court's denial of a motion notwithstanding the verdict is ""'"whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion."'"" (*Webb v. Special Elec. Co., Inc.* (2016) 63 Cal.4th 167, 192; see *Jorge v. Culinary Institute of America* (2016) 3 Cal.App.5th 382, 396.)  "For evidence to be substantial, it must be of ponderable legal significance, reasonable, credible, and of solid value.  [Citation.]  The 'focus is on the quality, not the quantity, of the evidence.'" (*Jorge*, at p. 396; see *Lui*, *supra*, 211 Cal.App.4th at p. 969.)  "We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment." (*Jorge*, at p. 396; see *Webb*, at p. 192; *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.)

"'Questions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo.'" (*Cuiellette, supra*, 194 Cal.App.4th at p. 765; see *Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604.)  "What plaintiff had to show in order to prevail on his FEHA claim is a question of statutory interpretation that we review de novo." (*Cuiellette*, at p. 765.)

B. *Substantial Evidence Does Not Support the Jury's Verdict that the City Discriminated Against the Plaintiffs*

FEHA makes it unlawful for an employer to discriminate against an employee because of the employee's physical disability.  (Gov. Code, § 12940, subd. (a);[4] *Green v. State of California* (2007) 42 Cal.4th 254, 262.)  The City does not contest, and we therefore assume for purposes of this appeal, that the plaintiffs' temporary injuries constituted "physical disabilities" under FEHA.  (See § 12926, subd. (m).)  Thus, we do not address the argument by amici curiae that FEHA does not apply to such temporary disabilities "with absolutely no long-term or permanent impact."  (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 572 ["[a]n amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae"]; *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 95, fn. 13 ["[g]enerally, 'an amicus curiae accepts a case as he or she finds it,' and 'additional questions presented . . . by an amicus curiae will not be considered'"].)

Section 12940 specifically limits the reach of FEHA by "'excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties.'"  (*Cuiellette, supra*, 194 Cal.App.4th at p. 766; accord, *Green, supra*, 42 Cal.4th at p. 262.)  Section 12940, subdivision (a)(1), provides:  "This part does not prohibit an employer from

---

[4]     Undesignated statutory references are to the Government Code.

21

refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations."

Thus, "[s]ection 12940 does not classify all distinctions employers make on the basis of physical disability as unlawful discrimination." (*Cuiellette, supra*, 194 Cal.App.4th at p. 766; accord, *Green, supra,* 42 Cal.4th at p. 262.) "Instead, such distinctions are prohibited '*only if* the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation.'" (*Cuiellette*, at p. 766; see *Green,* at p. 262.) To establish that an employer has discriminated on the basis of a disability in violation of FEHA, the plaintiff employee has the burden of proving he or she could perform "the essential functions of the job with or without reasonable accommodation." (*Green,* at p. 260; see *Furtado v. State Personnel Board* (2013) 212 Cal.App.4th 729, 744; *Cuiellette*, at p. 766.)

FEHA defines "essential functions" as the "fundamental job duties of the employment position the individual with a disability holds or desires." (§ 12926, subd. (f).) The City argues that, because the City hired the plaintiffs as recruit officers, they must show they were able to perform the essential functions of a police recruit in order to be qualified individuals entitled to protection under FEHA. The City argues that the plaintiffs cannot satisfy

22

their burden of proof under FEHA because they failed to show that they could perform those essential functions.

The plaintiffs do not directly respond to the City's argument. Instead, they contend that the relevant question is whether they could perform the essential functions of the positions to which they sought reassignment. The plaintiffs' argument improperly conflates the legal standards for their claim under section 12940, subdivision (a), for discrimination, and their claim under section 12940, subdivision (m), for failure to make reasonable accommodation, including reassignment. In connection with a discrimination claim under section 12940, subdivision (a), the court considers whether a plaintiff could perform the essential functions of the job held—or for job applicants, the job desired—with or without reasonable accommodation. (See *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 971 [to establish a FEHA claim for discrimination "the plaintiff must prove he is qualified for the position for which an accommodation is sought," not for another position requested as a reassignment]; see also *Furtado*, *supra*, 212 Cal.App.4th at p. 755 [distinguishing in the context of a failure to accommodate claim between the showing FEHA requires of "those seeking a position and those already in the position"].)

The question whether the plaintiffs could perform the essential functions of a position to which they sought reassignment is relevant to a claim for failure to accommodate under section 12940, subdivision (m), and to a claim for failure to engage in the interactive process under section 12940, subdivision (o). (See *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1223 [reassignment may be required where

23

"the employee cannot be accommodated in his or her existing position"]; *Spitzer v. The Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1389 [an employer generally has a duty under FEHA to reassign a disabled employee whose limitations cannot be reasonably accommodated in his or her current job]; Cal. Code Regs., tit. 2, § 11068, subd. (d)(1)(A) [reassignment may be a reasonable accommodation where "the employee can no longer perform the essential functions of his or her own position even with accommodation"]).  Thus, for the plaintiffs' discrimination claim, the issue is whether the plaintiffs could perform the essential functions of a police recruit.

### 1.    *The "Essential Functions" of a Police Recruit*

Evidence of "essential functions" may include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring employees to perform the function, the terms of a collective bargaining agreement, the work experiences of past incumbents in the job, and the current work experience of incumbents in similar jobs.  (§ 12926, subd. (f)(2); see *Furtado*, *supra*, 212 Cal.App.4th at p. 743.)  The record includes a variety of evidence establishing that the essential functions of a police recruit include rigorous physical demands and that the position's qualifications include successful completion of the Academy training program and obtaining POST certification.

The Department's Commanding Officer of Personnel Division testified that, in general, recruit officers must be able to perform the essential functions of police officers.  The job posting for a police officer at the time of the plaintiffs' separations from the Department stated that officers "must be in excellent health,

24

with no conditions that would restrict [their] ability to safely complete Academy training and perform police work." This requirement mirrors state law, which requires that peace officers "be free from any physical, emotional, or mental condition that might adversely affect the exercise of the powers of a peace officer." (§ 1031, subd. (f); see *White v. County of Los Angeles* (2014) 225 Cal.App.4th 690, 706 [standards of Government Code section 1031 "are part of every peace officer's job description, and must be maintained throughout a peace officer's career"].)[5]

The Department's specifications for the position of a police officer also listed a variety of qualifications including the ability to "[e]xert the physical stamina, strength, flexibility, and coordination to pursue and restrain fleeing suspects and defend oneself from physical attack." Similarly, a Department document titled "Essential Job Functions" stated that the position of police officer "exists to perform the function[s]" of making forcible arrests, controlling suspects, and searching, transporting, and booking suspects, among other things. (See *Lui*, *supra*, 211 Cal.App.4th at p. 966 [identifying essential functions of a police officer by reference to police department's "Sworn Members Essential Job Functions" list].) This document also stated that the "work experience of past or current" police officers included

5      "Physical condition is evaluated by a licensed physician and surgeon. '[M]ental and emotional condition is . . . evaluated by a psychiatrist or psychologist with five years[ ] experience in the diagnosis and treatment of emotional and physical disorders, and who has met education and training procedures set forth by the California Commission on Peace Officer Standards and Training designed for the conduct of preemployment psychological screening of peace officers.'" (*California Dept. of Justice v. Board of Administration etc.* (2015) 242 Cal.App.4th 133, 141.)

25

the Academy training program, an 18-month probationary period, and POST certification.

The goal of the Academy training program was to ensure police recruits could perform as required in the field. (See *Hastings*, *supra*, 110 Cal.App.4th at p. 967.) Completing the Academy training and obtaining POST certification requires considerable physical strength and exertion. The Department's Director of Police Training and Education testified that recruits must be able to scale a five-foot wall, pass a self-defense test, and successfully complete other physical tests. She stated that recruits who fail a required physical test can retake that test, but if a recruit fails a second time he or she is automatically expelled from the Academy. Recruits must also meet all POST standards before graduating from the Academy. According to the POST Bureau Chief for Training Program Services, POST standards require recruits to go over a six-foot fence in a certain amount of time, sprint 500 yards, navigate an obstacle course that simulates movements in a police foot chase, and drag a 150-160 pound dummy a certain distance.

The City's evidence showed that the essential functions of a police officer or recruit included demanding physical tasks. The plaintiffs did not introduce any evidence to the contrary.

> 2. *Undisputed Evidence Shows The Plaintiffs Could Not Perform the Essential Functions of a Police Recruit Even With a Reasonable Accommodation*

The plaintiffs do not contend on appeal, nor did they contend at trial, that they could have completed the Academy training program or performed the essential functions of a police

26

officer at the time of their separations from the Department. Indeed, none of the plaintiffs received medical clearance to continue his training until well after he left the Department.

Instead, the plaintiffs argue that they met their burden of proof by showing that they could perform the essential functions of the position of a recruit officer with a reasonable accommodation. Their suggested accommodation, however, would eliminate one or more essential functions of the job of a police recruit or officer, which renders the proposed accommodation unreasonable as a matter of law for purposes of a discrimination claim under section 12940, subdivision (a).

Under FEHA, "reasonable accommodation" means "'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.'" (*Furtado*, *supra*, 212 Cal.App.4th at p. 745, italics omitted; see *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974.) While the reasonableness of an accommodation is ordinarily a question of fact (*Nealy*, *supra*, 234 Cal.App.4th at p. 374; *Raine*, *supra*, 135 Cal.App.4th at p. 1227, fn. 11), FEHA does not require employers to eliminate essential functions of a job to accommodate a disabled employee. (See *Nealy*, at p. 375 ["elimination of an essential function is not a reasonable accommodation"]; *Furtado*, at p. 753 [waiving an essential requirement would mean that the plaintiff "would not have to demonstrate that he is a 'qualified individual'" under FEHA]; *Lui*, *supra*, 211 Cal.App.4th at p. 985 ["FEHA did not obligate defendant to accommodate plaintiff by excusing him from the performance of essential functions"]; Cal. Code Regs., tit. 2, § 11068, subd. (b) ["[w]here a quality or quantity standard is an essential job function, an employer . . . is not required to

27

lower such a standard as an accommodation"].)  As the court in *Nealy* explained, requiring employers to eliminate an essential function of a job to accommodate a disabled employee "would be at odds with the definition of the employee's prima facie case" under FEHA.  (*Nealy*, at p. 375.)  The employee's burden includes "showing he or she can perform the essential functions of the job with accommodation, not that an essential function can be eliminated altogether to suit his or her restrictions."  (*Ibid*.)

The plaintiffs contend that a reasonable accommodation included transferring them to other City positions under City Charter section 1014 or allowing them to remain in the Recycle program, neither of which included the physical duties required of police recruits.  For purposes of the discrimination claim, however, FEHA did not require the City to accommodate the plaintiffs by eliminating an essential function of the position of police recruit, such as modifying the Academy training program or requirement, waiving the POST certification requirement, or eliminating from a recruit officer's job duties the ability to make forcible arrests and control suspects.  (See *Furtado*, *supra*, 212 Cal.App.4th at p. 753 [plaintiff's "request that the Department essentially waive an essential function of a position is not a 'reasonable accommodation'"]; *Hastings*, *supra*, 110 Cal.App.4th at p. 971 [plaintiff failed to establish a prima facie case of discrimination under FEHA because "he is unable to perform the essential functions of a correctional officer (even with reasonable accommodation)"].)  Thus, the plaintiffs failed to show that they were "qualified individuals" under FEHA by showing that they

28

could perform the essential functions of a police recruit even with reasonable accommodation.[6]

C. *The Jury's Verdict That the City Failed To Make Reasonable Accommodations for the Plaintiffs Is Supported by Substantial Evidence and Is Not Contrary to Law*

The City argues that the jury's verdict finding the City liable under section 12940, subdivision (m), for failing to make reasonable accommodations must be reversed because, as a matter of law, "pre-probationary trainees like plaintiffs" are not entitled to accommodation by reassignment. Alternatively, the City argues that the plaintiffs failed to show that funded, open, and comparable positions for which they were qualified were available at the time of their respective separations from the Department.

---

[6] Because we conclude that the plaintiffs failed to prove a prima facie case for discrimination under section 12940, subdivision (a), we do not consider whether, as the City argues, the plaintiffs also failed to demonstrate that the City's reason for constructively discharging the plaintiffs—the so-called two-year rule—was pretextual. (See *Nealy, supra,* 234 Cal.App.4th at p. 378 [evidence that an employer's stated reason for an adverse employment action is pretextual becomes relevant only after the plaintiff establishes his or her prima facie case and the employer rebuts the presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse action]; accord, *Swanson v. Morongo Unified School District* (2014) 232 Cal.App.4th 954, 965; *Jenkins, supra,* 138 Cal.App.4th at p. 603.)

## 1. *Reassignment as a "Reasonable Accommodation" Under FEHA*

FEHA imposes on employers the duty to reasonably accommodate their employees' physical disabilities. (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 766; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1003.) Specifically, section 12940, subdivision (m)(1), makes it an unlawful employment practice to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." FEHA defines "reasonable accommodation" to include "reassignment to a vacant position." (§ 12926, subd. (p)(2); see Cal. Code Regs., tit. 2, § 11065, subd. (p)(2)(N).) Whereas an employer may not violate subdivision (a) of section 12940 by terminating a disabled employee who cannot perform the essential functions of his or her job even with a reasonable accommodation, the employer may violate subdivision (m) of section 12940 if the employer fails to reasonably accommodate that employee by reassigning him or her to a comparable, vacant position whose essential functions the employee can perform.

Where a disabled employee requests reassignment as an accommodation, "FEHA requires the employer to offer the employee 'comparable' or 'lower graded' vacant positions for which he or she is qualified." (*Nealy*, *supra*, 234 Cal.App.4th at p. 377; see Cal. Code Regs., tit. 2, § 11068, subd. (d)(1), (2).) FEHA does not require reassignment if there is no vacant position the employee is qualified to fill. (*Nealy*, at p. 377; *Cuiellette*, *supra*, 194 Cal.App.4th at p. 767; *Spitzer*, *supra*, 80 Cal.App.4th at p. 1389.) Nor does FEHA generally require the employer to promote the employee or to create a new position for

30

the employee.  (*Nealy*, at p. 377; *Spitzer,* at p. 1389; Cal. Code Regs., tit. 2, § 11068, subd. (d)(4).)

"'[A]n employer is relieved of the duty to reassign a disabled employee whose limitations cannot be reasonably accommodated in his or her current job only if reassignment would impose an "undue hardship" on its operations.'" (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 767; see *Spitzer*, *supra*, 80 Cal.App.4th at p. 1389.)  For example, FEHA may require as a reasonable accommodation a finite leave of absence to allow an employee time to recover from temporary injuries, but FEHA does not generally require an employer to provide an indefinite leave of absence to await possible future vacancies.  (*Nealy*, *supra*, 234 Cal.App.4th at pp. 377-378; *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 968.)  An employer's policy or practice of offering other employees the same or similar assistance or benefits requested by the plaintiff, however, is relevant to determining whether such assistance or benefits are "reasonable."  (See *Cuiellette*, at p. 767; *Raine*, *supra*, 135 Cal.App.4th at p. 1227, fn. 10; *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 950-951.)

Like a claim for discrimination under section 12940, subdivision (a), a claim for failure to accommodate under section 12940, subdivision (m), requires the plaintiff to show that he or she is a "qualified individual" under FEHA.  (See *Furtado*, *supra*, 212 Cal.App.4th at pp. 744-745; *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 977.)  Where the plaintiff contends that an employer failed to accommodate by reassigning him or her to another position, "the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is

31

sought, rather than the essential functions of the existing position." (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 255-256; accord, *Furtado*, at p. 755; *Nadaf-Rahrov*, at p. 977; see *Lui*, *supra*, 211 Cal.App.4th at p. 971; *Cuiellette*, *supra*, 194 Cal.App.4th at p. 769.) "Arguably, [the] plaintiff's burden of proving he is a qualified individual includes the burden of proving which duties are essential functions of the positions he seeks." (*Lui*, at p. 972.)

The duty to reasonably accommodate a disabled employee is a continuing one that is not exhausted by one effort. (*Swanson v. Morongo Unified School District* (2014) 232 Cal.App.4th 954, 969.) "A single failure to reasonably accommodate an employee may give rise to liability, despite other efforts at accommodation." (*Ibid.*; accord, *A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 464-465.)

>           2.      *An Employer's Duties Under FEHA, Including the Duty To Provide Reassignment as a Reasonable Accommodation, Extends to Probationary or "Pre-Probationary" Employees*

FEHA requires reassignment as a reasonable accommodation for employees, but not applicants. (See Cal. Code Regs., tit. 2, § 11068, subd. (d)(1) [as a reasonable accommodation, an employer may offer "an employee" a suitable, vacant position for which "the employee" is qualified].) Applicants are not entitled to reassignment because, unlike employees, they have never performed the essential functions of the original position and therefore are not initially qualified individuals under FEHA. (See *Quinn v. City of Los Angeles* (2000) 84 Cal.App.4th 472, 483 [employer had no obligation

32

under FEHA to accommodate an employee who "was never qualified to be hired from the outset"]; see also Equal Employment Opportunity Com., Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (2002) § 25 (EEOC Guidance), available at https://www.eeoc.gov/policy/docs/accommodation.html; 29 C.F.R. Pt. 1630, App., § 1630.2(o).)[7]

---

[7] The EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act states that an employee who "has never adequately performed the essential functions" of his or her job "is not entitled to reassignment because s/he was never 'qualified' for the original position." (EEOC Guidance, *supra*, at § 25.) Any such employee "is similar to an applicant who applies for a job for which s/he is not qualified, and then requests reassignment," but "[a]pplicants are not entitled to reassignment." (*Ibid.*) Similarly, the EEOC's Interpretive Guidance on Title I of the Americans With Disabilities Act, published as an appendix to 29 Code of Federal Regulations Part 1630, states: "In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship. Reassignment is not available to applicants. An applicant for a position must be qualified for, and be able to perform the essential functions of, the position sought with or without reasonable accommodation." (29 C.F.R. Pt. 1630, App., § 1630.2(o).) The EEOC's "definition of 'reasonable accommodation' appropriately guides our construction of the state laws" because "the California Legislature has modeled the reasonable accommodation requirements of section 12940(m) and section 12940(n) on the parallel federal requirements." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 974; see also *Spitzer*, *supra*, 80 Cal.App.4th at p. 1384.)

The City argues that FEHA did not require it to accommodate the plaintiffs by reassigning them to another position because, as "pre-probationary" employees who never completed their Academy training or probationary field assignments, the plaintiffs never qualified to become police officers and thus were not "qualified individuals" for purposes of their claim for failure to make reasonable accommodations. In essence, the Department argues we should treat the plaintiffs like applicants for employment in the Department rather than employees of the Department. We find no basis in the statute or other authorities for making "pre-probationary," probationary, or other employees in training ineligible for reassignment where such an accommodation is otherwise reasonable.

a. *FEHA applies to probationary and so-called "pre-probationary" employees*

In *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963 the court stated, "Whether a probationary employee is entitled under the FEHA to reassignment to a vacant position appears to be one of first impression," but the court never answered that question. (See *id.* at p. 972.) Instead, while concluding the plaintiff in that case did not qualify for the position to which he sought reassignment, the court in *Hastings* did not address whether FEHA would have required the employer to reassign him to that position if he had been qualified for it. (See *id.* at pp. 976-977.)

In *Swanson v. Morongo Unified School District*, *supra*, 232 Cal.App.4th 954 the court held that FEHA protects "probationary" employees, including by requiring reassignment, where such reassignment is reasonable. (*Id.* at pp. 967-968, 970.)

34

In that case an "untenured, probationary teacher" sued a school district under FEHA for not renewing her teaching contract after the teacher had requested a new assignment that would have accommodated her medical condition. (*Id.* at p. 967.) The school district argued that, because the plaintiff had no right to renewal of her contract, the district could assign her to any teaching position it deemed appropriate. (*Ibid.*) The court disagreed, stating that "[n]either [the plaintiff's] probationary status nor the District's discretion to make teaching assignments deprives [the plaintiff] of the FEHA's protections or otherwise allows the District to unlawfully discriminate against her." (*Ibid.*) The court observed that, if FEHA did not protect probationary employees because they could be terminated at any time, FEHA "would never apply to an at-will employee," which clearly is not the law. (See *id.* at p. 968.)

We acknowledge that the plaintiff in *Swanson*, unlike the plaintiffs in this case, was a veteran teacher of over 30 years, who was not in training at the time her employer allegedly refused to accommodate her medical condition. (See *Swanson, supra*, 232 Cal.App.4th at p. 959.) Nevertheless, we agree with the *Swanson* court's conclusion that an employee's probationary status does not, in and of itself, deprive an employee of the protections of FEHA, including a reasonable reassignment. The statute does not distinguish between the types of reasonable accommodations an employer may have to provide to employees on probation or in training and those an employer may have to provide to other employees. We decline to read into FEHA a limitation on an employee's eligibility for reassignment based on an employee's training or probationary status. (See *Kunde v. Seiler* (2011) 197 Cal.App.4th 518, 531 [""[u]nder the standard rules of statutory

construction, we will not read into the statute a limitation that is not there""]; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 826 ["it is not the court's place to insert words into the statute"].) Instead, the trier of fact should consider whether an employee is on probation or in training in determining whether a particular reassignment is comparable in pay and status to the employee's original position. (See *Nealy*, *supra*, 234 Cal.App.4th at p. 377; Cal. Code Regs., tit. 2, § 11068, subd. (d)(1), (2).)

Moreover, as the court in *Swanson* observed, probationary or otherwise untenured employees are akin to at-will employees under FEHA. (*Swanson*, *supra*, 232 Cal.App.4th at p. 968.) As with at-will employees, employers ordinarily can terminate probationary employees without good cause, notice, or a hearing. (*California School Employees Assn. v. Governing Bd. of East Side Union High School Dist.* (2011) 193 Cal.App.4th 540, 543, fn. 2.) FEHA nevertheless prohibits unlawful discrimination against such employees and entitles them to reassignment where reasonable. (*Jensen*, *supra*, 85 Cal.App.4th at pp. 250, 266 [at-will employee stated claim for failure to provide reasonable accommodation by reassignment]; cf. *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 898 ["[a]t-will employees, like other employees, are protected [by FEHA] from terminations which are 'motivated by legally proscribed, invidious discriminatory attitudes, such as animus toward a particular race or gender'"]; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1524 [the reason for terminating an at-will employee "need not be wise or correct so long as it is not grounded on a prohibited bias"].) FEHA entitles probationary and "pre-probationary" employees, like at-

36

will employees, to reasonable accommodation by reassignment in appropriate circumstances.

                  b.     *Determining whether probationary employees are "qualified" for reassignment*

As noted, where a FEHA plaintiff claims an employer failed to accommodate by reassigning him or her to another position, "the plaintiff proves he or she is a qualified individual [under FEHA] by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position." (*Jensen*, *supra*, 85 Cal.App.4th at p. 256; see *Furtado*, *supra*, 212 Cal.App.4th at p. 755; *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 977.) To distinguish between employees who may be entitled to reassignment and applicants or others who were never qualified for the job in the first instance, however, a plaintiff alleging a FEHA violation based on the failure to reassign must also show, as the City argues, that he or she actually performed the essential duties of the original position for some period of time. (See *Quinn*, *supra*, 84 Cal.App.4th at p. 483 [city had no obligation to explore possible accommodations for officer who "was never qualified to be hired from the outset"].)

The City argues the relevant yardstick for evaluating whether the plaintiffs qualify for reassignment is the position of a police officer, not a police recruit. According to the City, because the plaintiffs never completed the Academy and thus never performed the essential functions of a police officer, they are not entitled to reassignment. In support, the City points primarily to the EEOC Guidance, which "sets forth an employer's legal

37

obligations regarding reasonable accommodation" under the federal Americans with Disabilities Act (ADA).  The EEOC Guidance answers the question, "Is a probationary employee entitled to reassignment?" as follows:  "Employers cannot deny a reassignment to an employee solely because s/he is designated as 'probationary.'  An employee with a disability is eligible for reassignment to a new position, regardless of whether s/he is considered 'probationary,' as long as the employee adequately performed the essential functions of the position, with or without reasonable accommodation, before the need for a reassignment arose."  (EEOC Guidance, *supra*, § 25.)

The EEOC Guidance continues:  "The longer the period of time in which an employee has adequately performed the essential functions, with or without reasonable accommodation, the more likely it is that reassignment is appropriate if the employee becomes unable to continue performing the essential functions of the current position due to a disability.  *If, however, the probationary employee has never adequately performed the essential functions, with or without reasonable accommodation, then s/he is not entitled to reassignment because s/he was never 'qualified' for the original position.*  In this situation, the employee is similar to an applicant who applies for a job for which s/he is not qualified, and then requests reassignment.  Applicants are not entitled to reassignment."  (*Ibid.*, italics added.)

The EEOC Guidance thus provides that probationary employees may be entitled to reassignment unless they could never perform the essential functions of their "original position."  Contrary to the City's argument, the EEOC Guidance does not identify the "original position" as the position to which a

38

probationary employee may be promoted upon completion of his or her probation. In fact, the EEOC Guidance does not appear to contemplate circumstances in which, as here, an employee is hired into a training program from which he or she graduates into a different position. With regard to probationary employees in general, however, the EEOC Guidance requires employers to offer a reasonable reassignment so long as a disabled employee had performed the essential functions of his or her "current position" before requesting reassignment, not the position the employee would hold upon completing probation. (See EEOC Guidance, *supra*, § 25 [reassignment may be appropriate "if the employee becomes unable to continue performing the essential functions *of the current position*," italics added]; *ibid.* [providing an example of an employee who "work[ed] successfully" in her "current position" for nine months before requesting reassignment due to disability]; *ibid.* [reassignment is not required where an employee "was never able to perform the essential functions of the position . . . *for which he was hired*," italics added].) This interpretation is consistent with the cases cited by the City for its interpretation of the EEOC Guidance and with California authorities.

The City cites a federal district court's unpublished decision in *O'Brien v. Napolitano* (N.D. Cal. Feb. 8, 2012, C 10-01830 EDL) 2012 WL 423732, which, unlike the EEOC Guidance, is closer to this case because it involves a probationary employee hired into a training position. The court in *O'Brien* held that the plaintiff in that case was "not entitled to reassignment as an accommodation because she was a probationary employee who did not pass the training requirement *and* never adequately performed the essential functions" of her job. (*Id.* at p. 17, italics

39

added.)[8]  As in this case, the plaintiff in *O'Brien* was hired into a two-year training program, at the successful conclusion of which she could be "converted to a career or career-conditional appointment." (*Id.* at p. 2.)  Also as in this case, the essential functions of the plaintiff's training program and the eventual career position included strenuous physical activity. (*Id.* at p. 10.)  Unlike this case, however, the undisputed evidence in *O'Brien* showed that the plaintiff was never able to perform certain essential functions of her training position, not even for a single day, because she had been diagnosed with a debilitating medical condition before she was hired into the training program. (*Id.* at p. 4.)  Moreover, the court in *O'Brien* emphasized that under some scenarios probationary employees can be entitled to accommodation by reassignment. (See *id.* at p. 46 [citing *Kennelly v. Pennsylvania Turnpike Commission* (E.D. Pa. 2002) 208 F.Supp.2d 504, which held that a probationary employee may be entitled to reassignment where the employee was qualified to

_____

[8]      In rejecting the plaintiff's claim for failure to accommodate under the ADA, the court in *O'Brien* appears to have relied both on the plaintiff's status as a probationary employee and on the fact that she had not performed the essential functions of her job. (*O'Brien*, at pp. 10-11.)  The case cited by *O'Brien*, *Kennelly v. Pennsylvania Turnpike Commission* (E.D. Pa. 2002) 208 F.Supp.2d 504, involved a probationary employee, but that fact was not a factor in the *Kennelly* court's decision to deny the employer's motion for summary judgment.  Instead, the court in *Kennelly* concluded that there was a genuine issue of material fact regarding whether the employee was "'qualified' for the original position" because of his disability. (*Kennelly*, at p. 513.)  The plaintiff's status as a probationary employee was not legally significant in that case.

perform the duties of his original position before becoming disabled].)

The facts in *O'Brien* were similar to those in *Quinn v. City of Los Angeles*, *supra*, 84 Cal.App.4th 472, another case on which the City relies. In *Quinn*, a former police officer sued the City under FEHA after the Department terminated his employment. (*Id.* at p. 475.) At the time the plaintiff originally applied, he had a hearing impairment, which he disclosed to the Department. (*Id.* at p. 476.) As an applicant he failed a "sound localization test" and thus failed the requisite medical exam. (*Id.* at pp. 476-477.) As a result of a clerical error, however, the Department hired the plaintiff into the Academy, which he successfully completed. (*Id.* at p. 477.) After becoming a probationary patrol officer the plaintiff's condition interfered with his ability to hear the police radio and his partner's instructions, and the Department assigned him to a desk job before ultimately terminating his employment. (*Ibid.*) Following a jury verdict in favor of the plaintiff, the Court of Appeal reversed, holding that the plaintiff could not prevail on a claim for discrimination under FEHA because "uncontradicted evidence" (*id.* at p. 482) showed the plaintiff "was never initially qualified for the position from which he was discharged" (*id.* at p. 483). The court distinguished this fact pattern from one in which "an employee properly hired . . . subsequently suffers an adverse employment decision because of his disability." (*Ibid.*)

This case involves the fact pattern the court in *Quinn* distinguished. The City in this case never contended the plaintiffs were not "properly hired" or could not adequately perform the essential functions of a police recruit before they were injured. Instead, the City argues that employees like the

41

plaintiffs should not be entitled to any reasonable accommodation including reassignment.[9]  Neither FEHA nor any other authority cited by the City or its amicus curiae supports this argument. Instead, those authorities support the conclusion that probationary and "pre-probationary" employees in training are entitled to the benefits and protections of FEHA, including the right to reasonable accommodations.

Where such an employee alleges a FEHA violation based on the failure to reassign him or her to another position, the employee has the burden to prove he or she had adequately performed the essential functions of the position he or she held for some period of time before becoming disabled.  The City does not contest that the plaintiffs were able to perform the essential functions of a police recruit at the time they were hired, nor that each of them performed those duties, even if only for a relatively short time.  As the EEOC Guidance explains, the question then becomes whether the period of time in which the plaintiffs adequately performed the duties of a police recruit makes reassignment a "reasonable" accommodation.  (See EEOC Guidance, *supra*, § 25.)  Whether reassigning the plaintiffs to another position was "reasonable" is a question of fact for the

---

[9]     The City also argues that, as "pre-probationary employees," the plaintiffs "were not even entitled to any due process rights for termination."  (See *Cilderman v. City of Los Angeles* (1998) 67 Cal.App.4th 1466, 1471 [probationary officer "was afforded the due process appropriate to his status as a probationary employee"].)  Whether the plaintiffs were entitled to the due process rights of tenured officers, however, is not relevant to the City's obligations under FEHA, which extend to both probationary and non-probationary employees.

42

jury. (See *Nealy*, *supra*, 234 Cal.App.4th at p. 374 [the "reasonableness of an accommodation generally is a question of fact" for the jury]; accord, *Raine*, *supra*, 135 Cal.App.4th at p. 1227, fn. 11; *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 228, fn. 11.)[10]

### 3. *Reassignment to the Recycle Program Was Legally and Factually Reasonable*

The City argues that FEHA did not require it to reassign plaintiffs to other positions with the City or to the Recycle program until the plaintiffs healed or their disabilities became permanent. We conclude that reassignment to the Recycle program until the plaintiffs recovered or became permanently disabled was not unreasonable under the facts of this case and

---

[10] The City observes that recruits are hired into "temporary training positions" under Los Angeles Civil Service Rule 5.30, but does not argue that the plaintiffs are not entitled to accommodation by reassignment for this reason. Amici curiae take this position, citing *Jenkins*, *supra*, 138 Cal.App.4th 593 for the proposition that employers of temporary employees have no duty to accommodate those employees by reassigning them to permanent positions. (See *id.* at p. 604.) *Jenkins* makes clear, however, that its holding and the designation of the employee in that case as "temporary" depend on the facts and ordinances at issue in the case. (See *id.* at pp. 603-607.) Because the parties in this case have not briefed this issue, we do not reach it. We note, however, that the City's past practice of accommodating injured recruits in the Recycle program for various periods of time and through City Charter section 1014 transfers is inconsistent with the position that such recruits were mere "temps" with limited rights like the plaintiff in *Jenkins*.

that substantial evidence supports the jury's verdict that the plaintiffs were qualified for such an assignment.[11]

### a. *Reassignment to a temporary position is not unreasonable as a matter of law*

The City contends that reassigning the plaintiffs to the Recycle program until they recovered or became permanently disabled is per se unreasonable because FEHA does not require employers to temporarily accommodate injured employees indefinitely or to convert a temporary position into a permanent one. The City's statement of the law is not entirely correct. While FEHA does not *require* such accommodations, the law is that, to the extent an employer's policies or practices indicate such accommodations are reasonable, an employer may violate FEHA by not making those accommodations available to all employees.

In *Raine, supra*, 135 Cal.App.4th 1215 this court acknowledged that FEHA does not require an employer to make a disabled employee's temporary assignment permanent or to create a new position for a disabled employee, "*at least when the employer does not regularly offer such assistance to disabled employees.*" (*Raine*, at pp. 1226, 1228, italics added; see *Lui, supra*, 211 Cal.App.4th at p. 982.) In *Raine* the City of Burbank assigned the plaintiff, a disabled police officer, to a desk job while he recuperated from injuries. When his disability became permanent, the plaintiff asked the City of Burbank to assign him

---

[11] We do not consider whether a transfer under City Charter section 1014 to another City department was reasonable and supported by the evidence.

44

permanently to the desk job, a position normally reserved for civilians. (*Raine*, at pp. 1219-1220.) The evidence showed that the "only persons working the front desk on a *permanent* basis [were] civilian police technicians." (*Id*. at p. 1226.) Thus, this court held that the requested reassignment was unreasonable under FEHA. (*Id*. at p. 1227 & fn. 11.) We explained, "an employer has no duty (*absent perhaps workplace precedent suggesting its reasonableness*) to accommodate a disabled employee by making a temporary accommodation permanent if doing so would require the employer to create a new position just for the employee." (*Id*. at p. 1227, fn. omitted, italics added.)

*Cuiellette* illustrates how such workplace precedents can affect an employer's duties under FEHA. In *Cuiellette* the Los Angeles Police Department assigned a permanently disabled officer to a "purely administrative assignment requiring no field work." (*Cuiellette, supra,* 194 Cal.App.4th at p. 761.) Several days later the Department informed the officer that the City "could not allow him to work because he was '100% disabled.'" (*Id*. at p. 762.) At that time, however, "'the City of Los Angeles had a longstanding policy and practice of allowing sworn officers to perform "light duty" assignments that did not entail several essential functions of a peace officer such as making arrests, taking suspects into custody, and driving a police vehicle in emergency situations.'" (*Ibid*.) A lieutenant in the Department testified that, during his tenure with the Department, the City accommodated hundreds of disabled officers by placing them in light-duty assignments. (*Ibid*.) Indeed, even though the City had identified the essential duties of a police officer to include strenuous physical tasks that disabled officers could not perform, "'the City maintained permanent "light duty" vacancies in the

45

drug testing and fugitive warrants units for the specific purpose of accommodating disabled officers who wanted to continue to work.'" (*Id.* at pp. 762-763.)

Following a court trial, the trial court found that the City violated FEHA because it denied the plaintiff the accommodation he sought even though the City had an "informal policy" of "'permanently assigning disabled officers to positions that did not require many of the essential functions of a sworn police officer.'" (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 763.) In affirming, the Court of Appeal acknowledged the holding of *Raine* and the general proposition that FEHA does not require an employer to make a temporary position available indefinitely to accommodate a disabled employee, but found *Raine* factually distinguishable because the Department had not restricted the placement of disabled officers into temporary light-duty jobs at the time the plaintiff sought that assignment. (*Cuiellette*, *supra*, at pp. 767-769.)

Similarly, in *Lui*, the court held that the reasonableness of a particular accommodation must be determined in light of an employer's policies and practices. There, unlike the circumstances in *Cuiellette*, the San Francisco Police Department changed its policy of allowing injured police officers to remain in light-duty jobs indefinitely long before the plaintiff in that case sought such an accommodation. (*Lui*, *supra*, 211 Cal.App.4th at p. 965.) Thus, when the employment of the plaintiff police officer in *Lui* approached a one-year time limit on his light-duty assignment, the San Francisco Police Department told the plaintiff he could seek a transfer to another city job, disability retirement, an unpaid leave of absence, or sick or family medical

46

leave, but he could not stay in his light-duty desk job indefinitely. (*Id.* at p. 966.)

The court in *Lui* held that the San Francisco Police Department had not violated FEHA and found that the facts in that case were more like those in *Raine* than those in *Cuiellette*. (*Lui, supra,* 211 Cal.App.4th at pp. 982-983.) The court explained: "*Cuiellette* supports the proposition that employers must provide accommodations into permanent light-duty assignments if such assignments exist; *Cuiellette* does not support the proposition that employers are required to create permanent light-duty assignments to accommodate disabled employees." (*Lui,* at pp. 982-983.) The San Francisco Police Department's policy in force at the time the plaintiff became disabled assigned injured officers to administrative positions on a temporary basis only. Thus, the San Francisco Police Department "was not obligated to make plaintiff's [light-duty] assignment permanent, or to convert a different administrative position into a permanent light-duty position exempt from the duties in the [essential duties] List." (*Lui,* at p. 983.)

This case is more like *Cuiellette* than *Raine* and *Lui.* As in *Cuiellette*, the Department had a longstanding practice of allowing injured recruits to remain in the Recycle program indefinitely until they healed and could return to the Academy or until their disabilities became permanent. Lieutenant Palmer described the new policy of restricting injured recruits' assignments in the program to six months as "a significant and unprecedented change" in Department policy. That change occurred in September 2009, long after the plaintiffs became injured and entered the Recycle program. While FEHA does not require the Department to accommodate recruit officers injured

47

after the change in policy by allowing them to remain in the Recycle program indefinitely, the City could not treat the plaintiffs differently than it had treated other recruit officers who were injured before the change in policy. Indeed, in *Lui* when the San Francisco Police Department changed a similar policy it "grandfathered in" the officers accommodated under the old policy. (See *Lui*, *supra*, 211 Cal.App.4th at p. 966.)

We do not question the sincerity of the City's position that it had legitimate reasons to end the Recycle program, and that, going forward, *Raine* "instructs that the City is not obligated to revive this non-functional program." Nevertheless, having created the Recycle program and allowed past recruit officers to stay in the program until they recovered or became permanently disabled, the City could not deny the same accommodation to the plaintiffs, who entered the program before the City's change in policy. (See *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 228 [in "unusual circumstances, created by the [defendant] itself, we cannot say it was unreasonable as a matter of law for plaintiff to request" a particular accommodation]; see also *U.S. Airways, Inc. v. Barnett* (2002) 535 U.S. 391, 405-406 [an unreasonable accommodation may become reasonable in light of an employer's policy or even exceptions to that policy].)[12]

---

[12] The City also failed to convince the jury that allowing the plaintiffs to remain assigned to the Recycle program longer than six months was unreasonable in light of the fact that each of the plaintiffs signed the Revised Recruit Officer Recycle Policy limiting assignments to the Recycle program to six months. Notably, that Policy does not state whether recruits who cannot

b. *The plaintiffs were qualified for and capable of performing the essential functions of an assignment to the Recycle program*

At trial the plaintiffs did not explicitly identify the essential functions of their positions in the Recycle program or introduce testimony of their qualifications for those positions. Each of the plaintiffs, however, identified his duties in the Recycle program as including filing, answering phones, entering data, processing paperwork, and performing other clerical work, and the plaintiffs spent a considerable time performing these duties. The City never contested the plaintiffs' abilities to perform the jobs assigned to them in the Recycle program, nor did the City contend that the plaintiffs were not qualified for those jobs. Thus, because all of the plaintiffs had in fact performed satisfactorily while in the Recycle program, substantial evidence supports the jury's finding that the plaintiffs were qualified for and capable of performing the essential functions of a position in the Recycle program until they recovered fully or their disabilities became permanent. (See *Cuiellette*, *supra*, 194 Cal.App.4th at p. 763 [by having performed the administrative duties assigned to him, the plaintiff "proved that he could perform the essential functions of the position he aspired to fill and actually filled for a brief period of time"]; *id.* at pp. 762, 772 [trial court's finding that the plaintiff could perform the essential duties of a desk assignment he filled for "several days" supported the plaintiff's claim for failure to accommodate by reassignment].)

---

remain in the Academy would be terminated or transferred, where possible, to another Department or City position.

49

4.       *The City Failed To Demonstrate That Assigning the Plaintiffs to the Recycle Program Would Cause Undue Hardship*

Although the City does not make the argument on appeal, at trial the City suggested that maintaining the Recycle program for the benefit of the plaintiffs and similarly situated recruits would have caused the City undue hardship. The City, however, failed to convince the jury that any hardship was sufficient to make an otherwise reasonable accommodation unreasonable.[13]

Section 12940, subdivision (m)(1), places the burden of demonstrating undue hardship on the employer. (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 126-127; *Hastings*, *supra*, 110 Cal.App.4th at p. 972.) "Undue hardship" means "an action requiring significant difficulty or expense, when considered in light of the following factors:  [¶] (1) The nature and cost of the accommodation needed.  [¶] (2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of

_____

[13]     In addressing the question in the verdict form regarding undue hardship during his closing argument, counsel for the City stated, "As I mentioned earlier, if everybody who started the Academy were injured, when they get injured, if they were to all of a sudden have a claim to a permanent City job elsewhere, it would certainly cause a hardship.  It would mean there would be scores, if not more, people that would be able to short-circuit the civil service system [and] get in without tests."  The jury answered "no" to the verdict questions, "Was the accommodation requested by [each plaintiff] one that would have created an undue hardship on the City of Los Angeles?"

50

the facility.  [¶] (3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.  [¶] (4) The type of operations, including the composition, structure, and functions of the workforce of the entity.  [¶] (5) The geographic separateness or administrative or fiscal relationship of the facility or facilities."  (§ 12926, subd. (u).) "'Whether a particular accommodation will impose an undue hardship for a particular employer is determined on a case by case basis'" (29 C.F.R. § 1630.15(d) (Appendix: Interpretative Guidance on Title I of the Americans with Disabilities Act)) and "is a multi-faceted, fact-intensive inquiry." (*Bryant v. Better Business Bureau of Greater Maryland, Inc.* (D.Md. 1996) 923 F.Supp. 720, 737 [applying 42 U.S.C. § 12111 and 29 C.F.R. § 1630.2(p), whose definitions of "undue hardship" mirror those in FEHA].)

CACI No. 2545, pursuant to which the trial court instructed the jury on undue hardship, provides that undue hardship is an affirmative defense that the employer has the burden to prove.  The trial court instructed the jury here that to succeed on this defense the "City of Los Angeles must prove that the accommodations would be significantly difficult or expensive to make."  Among the factors the trial court told the jury to consider were the nature and cost of the accommodation, the City's ability to pay for it, the impact of the accommodation on the City's operations, the number of City employees and the relationship of those employees' duties to one another, and the

51

administrative and financial relationship of the City's facilities to one another.[14]

Thus, under California law and the instructions provided to the jury, an employer must do more than simply assert that it had economic reasons to reject a plaintiff's proposed reassignment to demonstrate undue hardship. (See *Swanson*, *supra*, 232 Cal.App.4th at p. 968.) An employer must show *why* and *how* asserted economic reasons would affect its ability to provide a particular accommodation. (*Ibid.*) Where, as here, an employer fails to meet its burden of proving undue hardship, the question on appeal is "'whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) Specifically, the question is whether the City's evidence of financial burden was (1) "'"uncontradicted and unimpeached"'" and (2) "'"of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; accord, *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769; *Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 390; see *In re R.V.* (2015) 61 Cal.4th 181, 201 [where party fails to meet its burden on an issue in the trial court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the [trial] court could not reasonably reject it"].) In fact, "[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by

---

[14] The City does not challenge this instruction.

52

arguing the evidence compels a judgment in his favor." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

The City has not met its "almost impossible" burden of showing the evidence compels a finding that the accommodations—in this case, reassignment to the Recycle program for an uncertain period of time—would cause undue hardship. The City explained at trial that it ended the Recycle program to comply with the two-year rule and to enable the Department to hire new, healthy recruits. The jury also heard testimony, however, that the consequences of failing to comply with the two-year rule were insubstantial because, had the plaintiffs been able to return to the Academy, the Department would have allowed them to do so even though their return would have violated the rule. Moreover, undisputed evidence showed that other injured recruits had remained in the Recycle program longer than six months, notwithstanding the Department's stated intent to end policies and practices inconsistent with the two-year rule.

On the issue of the economic burden of assigning the plaintiffs to the Recycle program, Francois Gardere, Commanding Officer of Personnel Division, testified that the City had implemented a hiring freeze in 2009. Because of the freeze, the Department was not able "to add any salaries to our account" without permission from the City Administrative Officer. Officer Gardere did not state, however, whether the Department ever sought or was denied such permission. Deputy Chief Jose Perez also testified that the hiring freeze affected the City's ability to hire new employees into civilian positions, but he did not comment on the freeze's impact on sworn officer positions. With

53

regard to police recruits, Lieutenant Palmer testified that "when you have 43 or so recruits in [the] Recycle program, that's 43 recruit positions that you can't hire someone else into. And the idea is to get the recruits into the Academy, get them through the six months [of Academy training] and get them out on the street where they can help public safety."

While this testimony ostensibly tied the economic cost of assigning the plaintiffs to the Recycle program to potentially lower staffing levels, the City offered no evidence to explain why this would result in "significant difficulty or expense." (§ 12926, subd. (u); see *Swanson*, 232 Cal.App.4th at p. 968 [rejecting the employer's economic burden argument where "the evidence does not show any reduction in funding required the elimination of [the plaintiff's position] or prevented the [defendant] from reassigning another [employee] to fill the [position] offered to [the plaintiff] or the [position] she ultimately received"].) For example, the City did not offer any evidence to show either that the expense of hiring additional recruits would have been too great in relation to the City's financial health or that the City could not have met its public safety needs if the plaintiffs remained in the Recycle program or if the City could not have hired additional recruits. (See, e.g., *E.E.O.C. v. Amego, Inc.* (1st Cir. 1997) 110 F.3d 135, 148-149 [medical facility demonstrated undue hardship by introducing evidence of the cost of hiring an additional employee to cover the duties plaintiff could not perform and by showing that the resulting staff-to-patient ratio would violate funding contracts and service plans]; *Vande Zande v. State of Wis. Dept. of Admin.* (7th Cir. 1995) 44 F.3d 538, 542 [employer may prove undue hardship by establishing that the costs of the proposed accommodation are excessive in relation

54

either to its benefits or to the employer's financial health or survival]; cf. *Lui, supra,* 211 Cal.App.4th at pp. 974-977 [police department proved that all officers, even those assigned to administrative duties, must be able-bodied by providing extensive evidence of the impact on public safety caused by a reduction in the number of "full duty" officers and the department's inability to hire more full duty officers due to budget cuts].)  The City's evidence does not compel a result contrary to the jury's finding that the accommodations requested by the plaintiffs would not have imposed an undue hardship on the City.[15]

D.  *The Damages Awards for Future Economic Damages Were Speculative*

The City attacks the jury's future economic damages awards as speculative and excessive.[16]  In particular, the City argues the damages the jury awarded for future economic losses were "astonishing" and "patently excessive" because the plaintiffs were "trainees who had completed only 8 hours to 18 weeks of *training*" and the awards assume the plaintiffs would have

---

[15]  Because we will affirm a judgment if it is supported by a verdict on any cause of action (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702; *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1155; see *Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 17 ["[w]e will affirm if a single cause of action is supported by the evidence"]), we do not reach the City's argument that substantial evidence does not support the jury's finding the City failed to engage in the interactive process.

[16]  The City does not challenge the awards for past economic damages or the awards for noneconomic damages.

passed the Academy, completed their probationary periods, become career officers, and retired from the Department. We agree with the City that the damages awards for future economic losses are speculative.

### 1. *Relevant Proceedings*

The trial court properly instructed the jury that future economic damages include the amount of income, earnings, salary and wages the plaintiffs would be "reasonably certain to lose in the future as a result of the injury." The plaintiffs introduced evidence of such losses through the testimony of an expert witness, Karen Smith. For all of the plaintiffs except Lee, Smith assumed the plaintiffs eventually would have returned to the Academy, complete their training, and become sworn police officers. Because Lee apparently was not "medically cleared" to return to the Academy at the time of trial, Smith assumed he eventually would have obtained a job with the City (presumably through a 1014 transfer) as a management analyst.[17]

---

[17] The record does not definitively state whether Lee could have returned to the Academy. He testified that he was "cleared to return to work" some time in 2013, and the City repeatedly states that Lee and the other plaintiffs were temporarily injured and had fully recovered from their injuries by the time of trial. In their respondents' brief on appeal, however, the plaintiffs reiterate that Smith's testimony assumed Lee could not have returned to the Academy. Although we do not reach the question whether a transfer under City Charter section 1014 was a reasonable and available accommodation, the City does not contest the basis for Lee's damages award. The City contends only that the damages awarded were speculative and excessive

Based on these assumptions, Smith calculated the present value of what each plaintiff would have earned had they worked as police officers (or in the case of Lee, as a management analyst) for 25-33 years, earning promotions along the way, and then received retirement income and benefits. Smith subtracted from these future earnings as mitigation the amounts the plaintiffs expected to earn in their then-current jobs, which Smith referred to as "offset earnings." Lee was not working at the time of the trial, but Smith assumed he eventually would become a retail sales clerk. The plaintiffs also introduced into evidence a "summary of present value of economic losses" Smith had prepared for each plaintiff.

The City did not introduce any expert testimony on economic damages. Nor did the City challenge Smith's credentials, object to her testimony, or object to the admission of any of the summaries of economic losses she had prepared. On cross-examination, however, Smith admitted her calculations rested on five key assumptions: that the plaintiffs (with the exception of Lee) would graduate from the Academy, complete their probationary periods, "like being police officers," stay with the Department until retirement age, and "be enamored enough with the job" to stay another five years to collect additional retirement benefits. When asked how she "c[a]me up with these assumptions," Smith said, "This is what I do on most of the cases." She admitted she did not have a "crystal ball that says [the plaintiffs are] actually going to work" for the Department, or at all, for all of the years included in her estimates.

and, with regard to Lee in particular, that the amount Smith used to calculate his offset was speculative.

Collectively, the jury awarded the plaintiffs over $6.5 million in future lost earnings, and the City moved for a new trial on the basis that the damages award was speculative and excessive. The trial court denied the motion, noting that Smith's conclusions were admitted into evidence "unchallenged" because the City did not object that they lacked foundation. The trial court found the damages award was not even "close to unreasonable."

2.      *Standard of Review and Governing Law*

Code of Civil Procedure section 657, subdivision (5), authorizes the trial court to vacate or modify a verdict or grant a new trial where the damages are excessive. On appeal from an order denying a new trial for damages, "[w]e make "'[a]ll presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. . . . [W]e do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor."' [Citations.] 'The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure.'" (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753-754; see *Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 602; *Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720.)

58

"'Whether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review."'" (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324; accord, *Rony*, *supra*, 210 Cal.App.4th at p. 753.) "'"The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence."'" (*Bermudez*, at p. 1324; accord, *Rony*, at p. 753.) We can reverse the trial court's ruling "'only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.'" (*Janice H.*, at p. 602; see *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 986; see also *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 511 (dis. opn. of Traynor, J.) ["'[t]o say that a verdict has been influenced by passion or prejudice is but another way of saying that the verdict exceeds any amount justified by the evidence,'" quoting *Zibbell v. Southern Pac. Co.* (1911) 160 Cal. 237, 255].)

A damage award must not be "'"speculative, remote, imaginary, contingent, or merely possible."'" (*In re Estate of Kampen* (2011) 201 Cal.App.4th 971, 991-992; *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 694; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989; see *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 602 ["[a]n award of damages must be predicated on something more than mere possibilities"].) Courts reviewing damages for the loss of future earnings have held such damages are recoverable "'where the evidence makes reasonably certain their occurrence and extent.'" (*Toscano*, at p. 694; see *Licudine v. Cedars–Sinai Medical Center* (2016) 3 Cal.App.5th 881, 887 ["the jury must fix a plaintiff's future earning capacity based on what it is 'reasonably probable' she could have

earned"].)  Indeed, "[d]amages must, in all cases, be reasonable."
(Civ. Code, § 3359; see *Licudine*, at p. 891; *Bermudez, supra,* 237
Cal.App.4th at p. 1328.)  Requiring the plaintiff to prove future
economic losses are reasonably certain "ensures that the jury's
fixing of damages is not wholly, and thus impermissibly,
speculative."  (*Licudine*, at p. 895; see *Piscitelli*, at p. 989 ["it is
fundamental that 'damages which are speculative, remote,
imaginary, contingent, or merely possible cannot serve as a legal
basis for recovery'"].)

Where, as here, a relatively young plaintiff suffers an
injury that prevents him or her from pursuing a specific career,
"courts have generally required some proof that the plaintiff is
far along in his or her training or experience" to justify future
economic losses.  (*Licudine, supra*, 3 Cal.App.5th at p. 896.)
Moreover, in general "'[t]he longer a proposed front pay period,
the more speculative the damages become.'"  (*Peyton v. DiMario*
(D.C. Cir. 2002) 287 F.3d 1121, 1128; see Chin et al., Cal. Practice
Guide: Employment Litigation (The Rutter Group 2016) ¶ 17:273,
pp. 17-45 to 17-46 ["[f]ront pay awards for lengthy time periods
may be challenged as being inherently speculative"].)

> 3.     *The City Did Not Forfeit the Argument That the*
>        *Jury's Award of Future Economic Damages Is*
>        *Speculative*

Plaintiffs contend the City's failure to object to Smith's
testimony at trial forfeited the City's argument that her opinion,
without more, does not constitute substantial evidence of the
plaintiffs' future economic damages.  The plaintiffs cite two lines
of cases in support of their contention, neither of which stands for
the proposition for which the plaintiffs cite it.  The plaintiffs first

60

cite three cases holding that a party's failure to object to an expert's testimony at trial forfeits the argument on appeal that the testimony was inadmissible. (See *People v. Bolin* (1998) 18 Cal.4th 297, 321 [defendant who failed to object to an expert's qualifications at trial forfeited the argument that expert testimony was inadmissible because the expert was not qualified]; *In re Estate of Odian* (2006) 145 Cal.App.4th 152, 168 [any objection to the admissibility of expert opinion on appeal was forfeited by failure to object at trial]; *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 776 [an appellant cannot challenge an expert's qualifications for the first time on appeal].) These authorities stand only for the proposition that the City has forfeited the right to appeal the admissibility of Smith's testimony (an argument the City does not make). They do not preclude the City from arguing Smith's opinion had no evidentiary support.

The plaintiffs also cite nine cases and two volumes of Witkin for the proposition that an expert's opinion "must be viewed as substantial evidence supporting the jury's verdict" if the opposing party failed to object to the expert's testimony at trial. That is not the law. The authorities cited by plaintiffs, including *People v. Panah* (2005) 35 Cal.4th 395, stand only for the proposition that expert testimony admitted at trial without objection is "competent" for purposes of considering on appeal *whether* sufficient evidence exists to support a finding. (See *id.* at p. 476 [hearsay testimony received without objection ""takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence""]; see also *People v. Bailey* (1991) 1 Cal.App.4th 459, 463 [reviewing court may consider inadmissible evidence introduced without objection at trial in

61

evaluating the sufficiency of evidence on appeal]; *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113 [reviewing court may consider incompetent evidence admitted without objection in support of a judgment]; *Yule v. Miller* (1927) 80 Cal.App. 609, 616 ["[e]vidence technically incompetent admitted without objection must be given as much weight in the reviewing court in reviewing the sufficiency of the evidence as if it were competent," and citing similar cases]; 3 Witkin Cal. Evidence (5th ed. 2012) Presentation at Trial, § 405, p. 561 [incompetent evidence, if received without objection, "will be considered in support of the judgment"]; 9 Witkin Cal. Procedure (5th ed. 2008) Appeal § 369, p. 427 [same].)  Competent evidence is not necessarily substantial evidence.

### 4. *The Record Does Not Support the Jury's Awards for Future Economic Damages*

An expert's testimony about a plaintiff's earning capacity must be grounded in reasonable assumptions (*Licudine, supra*, 3 Cal.App.5th at p. 897), not speculative or conjectural data (*Toscano, supra*, 124 Cal.App.4th at p. 696).  If the expert's opinion is not based on facts otherwise proved or if the opinion assumes facts contrary to the evidence, "it cannot rise to the dignity of substantial evidence."  (*Toscano*, at p. 696; accord, *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191-1192; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 [expert opinion "'may not be based "on assumptions of fact without evidentiary support"'"]; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 ["[t]he value of opinion evidence rests not in the conclusion

reached but in the factors considered and the reasoning employed"].)

Although Smith opined on the value of the plaintiffs' future economic damages, she provided or cited to no testimony, other evidence, or opinion on the likelihood that the plaintiffs would ever receive future earnings from the Department. (See *Licudine, supra*, 3 Cal.App.5th at p. 899 [plaintiff introduced no evidence "establishing a reasonable probability that she could have become qualified and fitted to earn a lawyer's salary"].) Indeed, absent from the record is any evidence, direct, statistical, or even anecdotal, of the likelihood that the plaintiffs would graduate from the Academy, successfully complete their probation, and serve as police officers until their retirement more than 25 years later (or, in the case of Lee, ever become a management analyst or remain in that career until retirement). (See *ibid.* [lack of evidence establishing likelihood that plaintiff would ever become a lawyer made future economic earnings from becoming a lawyer unreasonably speculative].) Because we "cannot ascertain with any certainty how [the plaintiff's expert] reached her assumption[s]" (*Toscano, supra*, 124 Cal.App.4th at pp. 696-697) regarding the plaintiffs' continued employment with the Department, the award of future economic losses is speculative. (See *Piscitelli, supra*, 87 Cal.App.4th at p. 990 [plaintiff's claim for lost commissions was speculative as a matter of law to the extent it was based on an unsupported assumption that an investment account would increase two-fold over time].)

Giving the plaintiffs the benefit of every inference we can draw from the evidence, we acknowledge that each plaintiff testified that he wanted to be a police officer and would have accepted another position with the City had the City offered one.

63

Each of the plaintiffs also testified that he would have stayed with the Department (though not specifically until retirement) had the Department not constructively or actually terminated him.  The jury could have inferred from this testimony that the plaintiffs wanted long careers with the Department.  Nevertheless, given their youth, the short amount of time each of them had spent in the Academy, and the fact that none of them had worked a day as a sworn police officer, the plaintiffs' personal intentions do not establish with any reasonable certainty that they would ever have become police officers, let alone remain with the Department for over 25 years and retire with maximum benefits.  (See *Toscano*, *supra*, 124 Cal.App.4th at p. 696 [employee's intentions or practices are not relevant to whether he could expect to remain employed until retirement where employment was at-will].)

Indeed, it appears highly unusual, though not unheard of, for a court to award front pay based on a wage differential over the employee's entire working life.  (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 388 ["[o]ccasionally, courts have awarded front pay based upon a wage differential that will persist over the employee's working life"]; see also Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 17:235, pp. 17-39 to 17-40.) *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, disapproved on other grounds by *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 665, was one of those unusual instances.  In *Bihun* the court held that the record supported an inference that the plaintiff would have stayed indefinitely with the defendant employer had she not been terminated unlawfully.  The record in *Bihun* showed the plaintiff

64

had spent eight years with her employer, received nothing but excellent evaluations, earned her law degree while working for her employer, chose to stay on the executive track at the company rather than go into private practice, and would have remained at the company indefinitely but for the sexual harassment she experienced.  (*Bihun,* at p. 996.)  As the City correctly argues, the evidence in this record pales in comparison to the type of evidence in *Bihun* that supported an inference the plaintiff would have remained with her employer until she retired had she not suffered unlawful harassment.  (See also *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 594 [affirming award of future earnings losses until retirement for 40-year-old employee who worked for the State for six years despite severe or pervasive harassment].)

The plaintiffs' expert "simply assumed" the plaintiffs would have completed their Academy training and probationary period and remained police officers for over 25 years, without any evidence of the likelihood that the plaintiffs would successfully run the table from the Academy to retirement.  (See *Toscano, supra*, 124 Cal.App.4th at p. 696.)  Given the considerable evidence describing the rigors of the Academy and the fact of the plaintiffs' past injuries (and in some cases multiple past injuries), Smith's assumptions were wholly conjectural.  While we acknowledge that some reasonable assumptions are necessary to determine front pay, the plaintiffs here failed to provide critical factual support for their expert's assumptions.  (See *Peyton, supra*, 287 F.3d at p. 1129 [damages award improperly assumed the plaintiff would have remained with her original employer for the rest of her career]; *Barbour v. Merrill* (D.C. Cir. 1995) 48 F.3d 1270, 1279, cert. dism. (1996) 516 U.S. 1155 ["[t]he plaintiff bears

65

the initial burden of providing the [fact finder] 'with the essential data necessary to calculate a reasonably certain front pay award'"].)

"An expert's opinion is only as good as the facts on which it is built." (*Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 253.) Here, there were no facts on which to build Smith's opinion on future economic damages. Even giving deference to the trial court's ruling denying the City's motion for a new trial and drawing all inferences in favor of it, the evidence is too speculative to lend support to the award of the plaintiffs' future lost earnings. (See *Toscano, supra*, 124 Cal.App.4th at pp. 695-696.) The City is entitled to a new trial on plaintiffs' claim for future economic damages.[18]

---

[18] The City does not argue it is entitled to judgment on plaintiff's claim for future economic damages because plaintiffs failed to meet their burden of proving those damages. (Cf. *Licudine, supra*, 3 Cal.App.5th at p. 899 [as a general rule, "[a] party faced with an adverse result may move for judgment notwithstanding the verdict when, among other things, the 'verdict' is 'not supported by the facts,'" and "when the facts are insufficient and '[w]hen the [nonmoving party] has had full and fair opportunity to present [her] case, . . . a judgment for [the moving party] is required and no new trial is ordinarily allowed'"].) To the contrary, the City asks that, in the event we affirm any part of the judgment on liability, we grant the City a new trial or reduce the award of damages. The City did not move for judgment notwithstanding the verdict on damages in the trial court, thus forfeiting the argument it is entitled to judgment on the claim for future economic damages. (See *Lee v. West Kern Water District* (2016) 5 Cal.App.5th 606, 634; *Simplon Ballpark, LLC v. Scull* (2015) 235 Cal.App.4th 660, 667-669.)

## DISPOSITION

The judgment is affirmed in part and reversed in part. The order denying the motion for a new trial is reversed, and the trial court is directed to enter a new order granting the motion for a new trial on future economic damages only. The trial court's order awarding plaintiffs their attorneys' fees and costs is vacated. In all other respects, the judgment is affirmed. The parties are to bear their costs on appeal.


SEGAL, J.

We concur:


PERLUSS, P. J.


KEENY, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

67