Filed 3/15/18

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GEORGE CORLEY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAN BERNARDINO COUNTY FIRE PROTECTION DISTRICT,<br><br>    Defendant and Appellant. | D072852<br><br>(Super. Ct. No. CIVDS1206008) |

APPEAL from a judgment of the Superior Court of San Bernardino,

John M. Pacheco, Judge.  Affirmed.

Gutierrez, Preciado & House, Calvin R. House, and Clifton A. Baker for

Defendant and Appellant.

Law Office of Christopher M. Carrillo and Christopher M. Carrillo for Plaintiff

and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for
publication with the exception of parts III.B, C, and D.

I.

INTRODUCTION

George Corley filed this action against his former employer, the San Bernardino County Fire Protection District (the District).[1]  The trial court held a jury trial on a single cause of action for age discrimination under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.).[2]  The jury rendered a special verdict in which it found that Corley's age was a substantial motivating reason for the District's termination of his employment and awarded damages for lost earnings.  The trial court subsequently entered a judgment in favor of Corley against the District awarding Corley $597,629 in damages, $853,443 in attorney fees, and $40,733 in costs.

On appeal, the District contends that the trial court erred in denying its request to instruct the jury pursuant to a provision in the Firefighters' Procedural Bill of Rights (§ 3254, subd. (c)).  The District also claims that the trial court erred in instructing the jury that "the use of salary as the basis for differentiating between employees when terminating employment may be a factor used to constitute age discrimination" if the employer's termination policy adversely affects older workers.  The District further maintains that there is insufficient evidence to support the jury's award of damages based

[1]      Corley's complaint was filed against the "San Bernardino County Fire *Department*."  However, the trial court entered an amended judgment against the "San Bernardino County Fire Protection *District*" and the appeal was taken by "San Bernardino County Fire Protection *District*."  (Italics added.)  It is undisputed that both titles refer to the same entity.

[2]      Unless otherwise specified, all subsequent statutory references are to the Government Code.

2

on its implicit finding that Corley would have been promoted but for the District's discrimination. Finally, the District claims that the trial court abused its discretion in applying a multiplier in awarding Corley statutory attorney fees. In the published portion of the discussion, we interpret section 3254, subdivision (c) and conclude that the trial court did not err in refusing to instruct the jury pursuant to this provision. In unpublished portions of the discussion, we conclude that the District fails to establish any reversible error with respect to its remaining claims. Accordingly, we affirm the judgment.

## II.

## FACTUAL BACKGROUND

### 1. *Corley's career*

In 2003, after a lengthy period of employment as a firefighter with the United States Forest Service, Corley accepted a position with the District as a battalion chief. Corley was promoted to the rank of division chief in 2005. While working for the District, Corley received numerous awards. A former District fire chief testified that Corley was "doing a very good job dealing with the communities" that he served. Corley's employee file contained no evidence of discipline. In his 2010 performance evaluation, Corley received an "exceeds standards" overall rating.

### 2. *Corley's termination*

In May 2011, the County of San Bernardino's Chief Executive Officer, Greg Devereaux, appointed Mark Hartwig as Fire Chief for the District. Chief Hartwig terminated Corley's employment with the District in February 2012. At the time of his

3

discharge, Corley was 58 years old, and was the oldest of the District's six division chiefs.

3. *Evidence of age discrimination related to Corley's termination*

In July 2011, Chief Hartwig and his deputy chief reassigned Corley to a location far from where Corley had worked for his entire career, to a region with a firefighting landscape with which Corley had little experience. Corley presented evidence from which the jury could infer that Chief Hartwig ordered the reassignment to encourage Corley to retire.

Corley also presented extensive evidence that the District's stated reason for his termination—incompatibility of management style—was a pretext for age discrimination. For example, Chief Hartwig testified that among the reasons that led him to conclude that Corley's management style was incompatible with his own was that Corley failed to prepare a contingency plan that Hartwig had asked all division chiefs to prepare. However, Chief Hartwig acknowledged that he had never asked for, nor received, a completed contingency plan from any of the division chiefs.[3]

---

[3]    Much of the trial focused on Corley's performance with respect to numerous matters upon which the District purportedly based its decision to terminate Corley, including: Corley's skill in managing a budget, Corley's response to a fire in January 2012, the satisfaction levels of representatives of two communities within the division that Corley managed, Corley's managerial skills in overseeing battalion chiefs, Corley's willingness to use "second alarms," in responding to certain fire incidents, Corley's response to a malfunctioning communication system, Corley's approval of payment for certain nonstandard firefighting equipment, and Corley's conversation with his supervisor about his girlfriend's potential employment with the District.

4

Corley also testified that he did not learn of any of the reasons that Chief Hartwig offered for concluding that Corley lacked a compatible management style until after he was terminated and filed this action. Further, while it had been the practice of the District to use progressive discipline with its employees, Corley did not receive any progressive discipline before being terminated. While Corley's direct supervisor, former deputy fire chief Dan Odom, testified that he had given Corley verbal warnings to improve his management style, Odom also acknowledged that he had never documented such warnings, as is required. Odom also acknowledged that he had not given Corley any written warnings or placed him on a work performance improvement plan.

Chief Hartwig promoted Donald Trapp to serve as Corley's replacement. Trapp was 48 years old at the time of his promotion to division chief. Prior to promoting Trapp, Chief Hartwig altered the qualifications for division chief to remove a long-standing District requirement that an applicant for the position have a minimum of two years of battalion chief experience. Trapp could not have become a division chief but for the change because he lacked the necessary battalion chief experience.

Union representative and District firefighter Bret Henry recalled that Chief Hartwig was frustrated that Corley would not retire. When asked whether he had ever heard Trapp say that he "wanted to get rid of older workers," Henry responded in the affirmative. At Devereaux's request, Henry prepared a list of chief officers. The list included the names and corresponding ranks of all of the chief officers in the District. Trapp knew of the list and admitted that Corley's name was on the list. Corley believed

5

that the list was used to target chief officers for termination in order to replace them with younger chief officers.

According to a District employee, Corley's salary and benefits were $11,372 more than Trapp's when Trapp replaced him as division chief. In addition to these direct savings that resulted from Corley's termination, Corley and another former District division chief testified that the District would achieve additional "cascading" savings as lower paid employees were promoted in the wake of Trapp's promotion to division chief.

III.

DISCUSSION

A. *The trial court did not err in denying the District's request to instruct the jury pursuant to a special instruction modeled on a provision in the Firefighters' Procedural Bill of Rights*

The District claims that the trial court erred in denying its request to instruct the jury pursuant to a special instruction modeled on a provision contained in the Firefighters' Procedural Bill of Rights (the Act).

We conclude that the trial court properly refused to instruct the jury pursuant to the proffered instruction. As discussed below, the provision of the Act on which the District based its proposed special instruction, section 3254, subdivision (c), pertains only to a jurisdiction's "fire chief," and it is undisputed that Corley was never the District's fire chief.

1. *Factual and procedural background*

The District filed a written request that the court instruct the jury pursuant to the following special jury instruction:

6

"A fire chief shall not be removed by a public agency or appointing authority without providing that person with written notice, the reason or reasons for removal, and an opportunity for administrative appeal.

"The removal of a fire chief by a public agency or appointing authority, for the purpose of implementing the goals or policies, or both, of the public agency or appointing authority, or for reasons including, but not limited to, incompatibility of management styles or as a result of a change in administration, shall be sufficient to constitute 'reason or reasons.' "

During a hearing on jury instructions, the District argued that the trial court should provide the instruction because "Chief Corley was provided with all of these rights required by [section 3254, subdivision (c)] as it states in his termination letter . . . and it also shows that he was terminated for the reasons that are expressly permitted in [section 3254, subdivision (c)], specifically change in administration and incompatibility of management style."

Corley's counsel objected the instruction on several grounds, including that the provision on which the instruction was based, section 3254, subdivision (c), applies only to the "lead fire chief" of a jurisdiction. The court responded by asking Corley's counsel whether it would be acceptable for the court to provide only the first sentence of the instruction to the jury. Corley's counsel responded:

"[I]t would not be, your Honor, because again, the first sentence still says a fire chief and everything here in the [Act] regarding fire chief is implying the actual lead fire chief. And it's not applicable in our case."

After further discussion during which the court indicated its willingness to provide the first sentence of the proposed instruction if it were modified to refer to a "division

7

chief,"[4] the District's counsel stated, "Well, I would prefer to not have it at all if it's just going to be the first paragraph, the first sentence."

The court responded, "We'll just take it out."

2. *Governing law*

a. *Applicable law governing a party's request for a jury instruction*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) " 'The trial court is not required to give instructions [that] are not correct statements of the law or are incomplete or misleading [citation].' " (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242.)

b. *Relevant principles of statutory interpretation*

In *Yohner v. California Dept. of Justice* (2015) 237 Cal.App.4th 1, 7 (*Yohner*), this court restated the following well-established rules of statutory interpretation:

> " ' "In construing any statute, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and

---

4    As noted in part II, *ante*, the District employed Corley as a division chief at the time of his discharge.

8

should be construed in their statutory context.' [Citation.] If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" [Citation.]

" ' "If, however, the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will 'examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes,' and we can ' " 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' [Citation.]" [Citation.]'

" ' " 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' "

    c. *The Act*

      1. *The text of the Act*

In 2007, the Legislature adopted the Act. (§ 3250 et seq.; see Stats. 2007, ch. 591, § 2 (A.B. 220).) The Act "provides firefighters with certain rights concerning their employment." (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384.) Section 3254 contains various restrictions on the taking of certain punitive actions against firefighters. Section 3254, subdivisions (a), (b), (d), (f), and (g), all expressly pertain to "firefigher[s]."

Section 3254, subdivision (c), the statute on which the District based its special instruction, pertains to a "fire chief." Section 3254, subdivision (c) provides:

"(c) *A fire chief* shall not be removed by a public agency or appointing authority without providing that person with written

9

notice, the reason or reasons for removal, and an opportunity for administrative appeal.

"For purposes of this subdivision, the removal of *a fire chief* by a public agency or appointing authority, for the purpose of implementing the goals or policies, or both, of the public agency or appointing authority, or for reasons including, but not limited to, incompatibility of management styles or as a result of a change in administration, shall be sufficient to constitute 'reason or reasons.'

"Nothing in this subdivision shall be construed to create a property interest, if one does not otherwise exist by rule or law, in the job of *fire chief*."  (Italics added.)

Section 3251 of the Act contains a list of definitions and provides in relevant part:

"(a) 'Firefighter' means any firefighter employed by a public agency, including, but not limited to, any firefighter who is a paramedic or emergency medical technician, irrespective of rank.  However, 'firefighter' does not include an inmate of a state or local correctional agency who performs firefighting or related duties or persons who are subject to Chapter 9.7 (commencing with Section 3300).  This chapter does not apply to any employee who has not successfully completed the probationary period established by his or her employer as a condition of employment."

The Act does not define the term "fire chief."

### 2. *Relevant legislative history of the Act*

The legislative history of the Act makes clear that the Act "is modeled after the Public Safety Officers Procedural Bill of Rights Act (known as POBOR)."  (Sen. Appropriations Committee, Fiscal Summary of Assem. Bill. 220 (2007–2008 Reg. Sess.) as amended July 2, 2007, par. 5; see e.g., Sen. Judiciary Committee, Analysis of Assem. Bill. 220 (2007–2008 Reg. Sess.) as amended July 2, 2007, par. 1 ["The bill would enact the Firefighters Procedural Bill of Rights Act, to mirror the Public Safety Officers

10

Procedural Bill of Rights Act (commonly known as POBOR) that is applicable to public safety officers"].)

### d. *POBOR*

#### 1. *The text of section 3304, subdivision (c) of the POBOR*

Section 3304, subdivision (c) of the POBOR is nearly identical to section 3254, subdivision (c) of the Act. Section 3304, subdivision (c) provides:

> "No chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefor and an opportunity for administrative appeal.
>
> "For purposes of this subdivision, the removal of a chief of police by a public agency or appointing authority, for the purpose of implementing the goals or policies, or both, of the public agency or appointing authority, for reasons including, but not limited to, incompatibility of management styles or as a result of a change in administration, shall be sufficient to constitute 'reason or reasons.'
>
> "Nothing in this subdivision shall be construed to create a property interest, where one does not exist by rule or law, in the job of Chief of Police."

#### 2. *The legislative history of section 3304, subdivision (c)*

In *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 368 (*Robinson*), the Court of Appeal reviewed the legislative history of section 3304, subdivision (c) as follows:

> " 'According to the bill's sponsor, "Senate Bill 2215 is a very simple bill. It provides that the Chief of Police may not be disciplined without just cause. Historically, California law enforcement has been the finest in the nation precisely because the Legislature has seen the wisdom of separating police organizations from the political process. This is why police officers, once they pass probationary status, are protected from termination except for just cause.

11

" ' "Ironically, a Chief of Police, who has reached the apex of his or her law enforcement career, reverts to the status of a mere probationary employee. In other words, a Chief of Police may be dismissed for any reason. Senate Bill 2215 does not guarantee that police chiefs cannot be fired. If a chief fails to perform as expected, fails to follow the policy direction of the city council, or fails to properly lead the department, they can, and should be terminated or otherwise disciplined by the city council. What Senate Bill 2215 does do is protect chiefs from whimsical pressures that diminish the professionalism of the law enforcement mission." ' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 2215 (1997–1998 Reg. Sess.) as amended May 19, 1998, p. 3.)" (*Robinson*, at pp. 379–380.)

The *Robinson* court also noted that the legislative history of section 3304, subdivision (c) demonstrated that the statute was enacted in response to instances in which chiefs of police had been subjected to political pressure.

"The analysis also described instances of abuse where chiefs of police were threatened with removal for inappropriate reasons by local politicians. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 2215 (1997–1998 Reg. Sess.) as amended May 19, 1998, pp. 3–4.) In noting the arguments presented for and against the bill, the analysis included a comment from a police chief who stated the simple protections provided in the bill would help insulate chiefs from the politics in the community, which would lessen the likelihood of corruption and favoritism. (*Id.* at p. 5.)" (*Robinson*, *supra*, 202 Cal.App.4th at p. 380.)

### 3. *Application*

The text of section 3254, subdivision (c) supports the conclusion that the provision applies solely to a jurisdiction's lead "fire chief."[5] The statute refers to "a fire chief"

---

5       In its brief in support of a motion for new trial, the District argued that it did "not matter" whether section 3254, subdivision (c) applies solely to a jurisdiction's lead fire chief. In support of this argument, the District contended that its proffered special

(§ 3254, subd. (c)), without referring to "deputy chiefs," "assistant chiefs," "division chiefs" or the like. Moreover, section 3254, subdivision (c) provides no definition of the term "fire chief," as one might expect if the statute were meant to apply to any position with the word "chief" in it. Further, the final sentence of section 3254, subdivision (c) strongly suggests that the term "fire chief" refers to a single position, namely the "job of fire chief" of a jurisdiction. (See *id.*, subd. (c) ["Nothing in this subdivision shall be construed to create a property interest, if one does not otherwise exist by rule or law, in the job of *fire chief*" (italics added)].)

As discussed above, the text and legislative history of the Act unequivocally demonstrate that the Act was modeled on the POBOR. Further, the text of section 3254, subdivision (c) of the Act and section 3304, subdivision (c) of the POBOR make clear that the former was modeled on the latter. The legislative history of section 3304, subdivision (c) in turn demonstrates that that statute was enacted to apply solely to a jurisdiction's "Chief of Police." (§ 3304, subd. (c); see *Robinson*, *supra*, 202 Cal.App4th at pp. 379–380 [reviewing the legislative history of section 3304, subdivision (c) and noting that it was passed to protect "a Chief of Police, who has reached the apex of his or her law enforcement career"].) Accordingly, interpreting section 3254, subdivision (c) as similarly pertaining solely to a jurisdiction's "fire chief," harmonizes the meaning of these two closely related statutes. (See *Yohner*, *supra*, 237 Cal.App.4th at p. 8 [in interpreting

---

instruction should have been provided in order to refute Corley's evidence of pretext, even if the statute did not *actually* apply to a division chief such as Corley. The District did not raise this argument on appeal, and we therefore express no opinion on the issue.

a statute a court is to " 'examine the context in which the language appears, adopting the construction that best harmonizes the statute . . . with related statutes' ".)

The District's sole statutory interpretation argument to the contrary is unconvincing.[6] The District notes that the word, "a" is an indefinite article that signals a generic reference, while the word, "the" is a definite article that refers to a specific person. The District further notes that section 3254, subdivision (c) refers to " '*a* fire chief,' " (italics added) and contends, "If the Legislature had meant to refer only to the head of a fire protection agency, it would have done so by using the definite article rather than the indefinite one." However, the statute's use of the indefinite article in referring to "a fire chief" (*id.*, subd. (c)), may reasonably be interpreted to reflect an intent to have the provision apply generically to all fire chiefs in the state (i.e., the heads of each jurisdiction's fire protection agency). Thus, the Legislature's use of the indefinite article "a," does not demonstrate its intent for section 3254, subdivision (c) to apply to persons other than a jurisdiction's fire chief.

Accordingly, we conclude that the trial court did not err in refusing to instruct the jury pursuant to the District's proffered special instruction premised on section 3254, subdivision (c).[7]

---

[6] The District offered the statutory interpretation argument discussed in the text in its reply brief. In its opening brief, the District did not provide any argument in support of its contention that section 3254, subdivision (c) applies to a division chief such as Corley.

[7] In light of our conclusion, we need not consider Corley's argument that the trial court did not err in refusing to provide the special instruction because the instruction was "redundant and unnecessary." In support of this contention, Corley notes that the trial

14

B. *Any error that the trial court may have committed in instructing the jury with respect to its consideration of evidence pertaining to differences in employees' salaries in determining the existence of age discrimination was harmless*

The District claims that the trial court erred in instructing the jury that "the use of salary as the basis for differentiating between employees when terminating employment may be a factor used to constitute age discrimination." We conclude that any error committed by the trial court in instructing the jury with respect to this issue was harmless.

1. *Factual and procedural background*

Prior to the trial, Corley filed a series of proposed jury instructions that included the following special instruction:

> "The use of salary as the basis for discriminating between employees, when terminating employment, may be found to constitute age discrimination if the use of that criterion adversely impacts older workers as a group."

The District filed a written objection to Corley's proposed special instruction prior to the trial in which it contended that the "instruction has no applicability to this case and should not be given." Specifically, the District contended that the instruction was based on a portion of section 12941,[8] which was enacted to make clear that a plaintiff could

---

court provided a "business judgment" instruction to the jury that stated in relevant part, "[A]n employer may discharge an employee for no reason, or for a good, bad, mistaken, unwise, or even unfair reason, as long as its action is not for a discriminatory reason." Nor need we consider whether any error in failing to instruct the jury pursuant to the District's special instruction was harmless given that the trial court provided a business judgment instruction to the jury.

[8] Section 12941 provides:

> "The Legislature hereby declares its rejection of the court of appeal opinion in *Marks v. Loral Corp.* (1997) 57 Cal.App.4th 30, and states that the opinion does not affect existing law in any way,

15

prove that the use of salary as the basis for differentiating between employees when terminating employment constituted age discrimination based on a disparate *impact* theory of discrimination.  The District contended that this portion of section 12941 had "no applicability in this case" because Corley's action was premised on a disparate *treatment* theory of discrimination, not disparate *impact*.[9]  The District further argued

including, but not limited to, the law pertaining to disparate treatment.  The Legislature declares its intent that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group, and further declares its intent that the disparate impact theory of proof may be used in claims of age discrimination.  The Legislature further reaffirms and declares its intent that the courts interpret the state's statutes prohibiting age discrimination in employment broadly and vigorously, in a manner comparable to prohibitions against sex and race discrimination, and with the goal of not only protecting older workers as individuals, but also of protecting older workers as a group, since they face unique obstacles in the later phases of their careers.  Nothing in this section shall limit the affirmative defenses traditionally available in employment discrimination cases including, but not limited to, those set forth in Section 7286.7 of Title 2 of the California Code of Regulations."

[9]     In *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 893, the court summarized the differences between disparate *treatment* and disparate *impact* claims:

" 'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds.  [Citation.]  A disparate treatment claim, i.e., a claim that an employer has treated a particular person less favorably than others because of the plaintiff's race, sex, or other protected category, 'involve[s] "the most easily understood type of discrimination." '  [Citation.]  A claim of *disparate impact* differs from a claim of disparate treatment in that a plaintiff is not required to prove discriminatory motive when claiming disparate impact.  Disparate impact exists where, '*regardless of motive*, a facially neutral employer practice or policy, bearing no manifest

16

that it was inappropriate to provide the instruction in a disparate treatment case such as Corley's because the "instruction would effectively tell the jury that replacing an older, higher-paid employee with a younger, lower-paid employee is age discrimination," which is improper. Finally, the District argued that it was improper to give the instruction because there was no evidence that the District used salary as a basis for discriminating against older workers as a group.

During the trial, the court held a hearing outside the presence of the jury concerning the District's objections to Corley's proposed special jury instruction. The District reiterated the arguments made in its written objections. The court agreed with the District that there was no evidence that the District had discriminated against older workers "as a group," and stated that the proposed instruction would have to be modified to remove the reference to "older workers as a group." However, the court remarked that section 12941 referred both to discrimination against older workers as a "group," and discrimination against older workers as "individuals." The court also stated that it believed that the jury could consider evidence that the District saved money by terminating Corley as a factor in proving that the District discriminated against him as an individual on the basis of age.

Corley's counsel emphasized that the proposed instruction stated that evidence of the termination of higher salaried employees "may" be found to constitute age discrimination, and that the proposed instruction did not say that such evidence "shall" be

relationship to job requirements, in fact had a disproportionate
adverse effect on members of the protected class.' "

17

found to constitute discrimination. After hearing further argument from counsel, and considering possible ways of modifying the proposed instruction, the court stated that it had not "decided on it yet." The court proceeded to discuss other proposed jury instructions.

Later during the hearing, the trial court suggested that the instruction be modified to state that "the use of salary as a basis for discriminating between employees when terminating employment may be a *factor* to constitute age discrimination," rather than stating that the use of salary in this manner "may be *found* to constitute age discrimination." (Italics added.) The District's counsel stated that the modified instruction was "much better than the way it is presently worded as far as the [d]efense is concerned." However, defense counsel added, "I still would rather not [have it] give[n] . . . at all." The court indicated that it would provide the modified special instruction using the "may be a factor" language.

The trial court instructed the jury:

"The use of salary as the basis for differentiating between employees when terminating employment may be a factor used to constitute age discrimination if the use of that criterion adversely impacts older workers."

2. *We need not determine whether the trial court erred in giving the special instruction because any error was harmless*

Corley acknowledges that the jury instruction at issue is a "disparate impact instruction." However, he argues that the trial court properly gave the instruction because he "presented both a disparate treatment theory and a disparate impact theory for the jury

18

to consider in [his] case in chief."[10] We need not determine whether Corley presented substantial evidence that warranted giving the instruction because we conclude that any error that the trial court may have committed in giving the instruction was harmless.

a. *The law governing the determination of prejudice*

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule*, *supra*, 8 Cal.4th at p. 580.) " 'No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party.' " (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1112.)

An instructional error is harmless where "it is not reasonably probable defendant would have obtained a more favorable result in its absence." (*Soule*, *supra*, 8 Cal.4th at p. 570.) "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's

---

10     Corley does not dispute that he did not request that the trial court instruct the jury pursuant to CACI No. 2502, the standard jury instruction outlining the essential factual elements of a disparate impact employment discrimination claim. Aside from the special jury instruction discussed in the text, the trial court did not instruct the jury on any aspect of a disparate impact claim.

verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Id.* at pp. 570–571.)[11]

b. *Application*

In considering " 'the degree of conflict in the evidence on critical issues' " (*Soule*, *supra*, 8 Cal.4th at p. 570), we observe that Corley presented considerable evidence from which the jury could find that Corley was discriminated against on the basis of age, premised upon several different types of evidence. For example, Corley presented evidence that decision makers at the District, including Chief Hartwig, made remarks about wanting older workers to retire, including Corley; that the District reassigned older employees to undesirable job locations in the hope that doing so would encourage them to retire;[12] and that the District's stated reasons for terminating Corley's employment were pretextual. The District's only argument with respect to this factor is that "Chief Hartwig and Deputy Chief Odom testified to their dissatisfaction with Chief Corley's performance, and their conclusion that he was not a good fit for upper management . . . ."

[11]   In raising a claim of instructional error, an appellant has a "duty to tender a proper prejudice argument." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)  In its opening brief, the District failed to address the *Soule* factors.  However, after Corley outlined the proper law governing the District's claim of instructional error in his respondent's brief and addressed the *Soule* factors, the District addressed the factors in reply.  Under these circumstances, we conclude that the District's failure to tender a proper prejudice argument in its opening brief did not deprive Corley of the opportunity to address the issue.  Accordingly, we exercise our discretion to consider the District's arguments as to prejudice, notwithstanding its failure to properly raise a prejudice argument in its opening brief.  (Cf. *Jameson v. Desta* (2009) 179 Cal.App.4th 672, 674 [exercising discretion to consider issue raised distinctly by appellant for the first time in reply where respondent briefed issue].)

[12]   The jury heard evidence that this practice was referred to by management in the District as "freeway therapy."

While we acknowledge the existence of this testimony, the jury was unlikely to find it compelling, given the lack of tangible evidence of Corley's poor performance.

In determining the potential for prejudice from the instruction in affecting the jury's consideration of the evidence presented at trial, we also observe that the instruction pertained to a relatively minor portion of the evidence. The vast bulk of the trial evidence pertained to matters other than differences in employees' salaries. Since the instruction pertained to only a relatively minor portion of the evidence presented at trial, the potentially prejudicial impact of the instruction was minimal. (See *Soule*, *supra*, 8 Cal.4th at p. 571 [concluding instruction on consumer expectations theory of design defect was harmless in part because "the consumer expectations theory was never emphasized at any point," in the trial].)

With respect to the second factor, we see no basis on which to conclude that Corley's counsel's argument contributed to the instruction's misleading effect. Corley's counsel's closing argument was premised largely on a discussion of evidence *other* than that pertaining to employees' salaries. While Corley's counsel did mention evidence demonstrating that the District would save money by firing a "top step employee"[13] such as Corley, Corley's counsel made clear that the jury should consider such evidence in determining whether the District discriminated against Corley on the basis of age. At no time during his argument did Corley's counsel suggest that the jury could "conclude that

---

13     The jury heard evidence from which it could infer that "top step" workers were those workers who were paid at the high end of the District's "wage schedule[ ]," for a given position.

21

there was discrimination based *solely* on salary differential," (italics added) which the District contends is the prejudicial effect of the trial court's instruction.

In addition, none of the other *Soule* factors supports reversal. The jury did not request a rereading of the erroneous instruction or ask questions pertaining to related evidence. The jury's verdict, 11-1 in favor of Corley, was not close.

Finally, in considering "the effect of other instructions in remedying the error" (*Soule*, *supra*, 8 Cal.4th at p. 571), the court instructed the jury that in order for it to find that the District wrongfully discriminated against Corley on the basis of age, it was required to find that "George Corley's age was a substantial motivating reason for the [District's] decision to discharge George Corley." The court also emphasized the significance of the need for the jury to find that Corley's age was a "substantial motiving reason," for his termination by instructing the jury as to the legal meaning of this term, as follows:

> "A substantial motivating reason is a reason that actually contributed to the discharge. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the discharge."[14]

Further, the special verdict form stated, "Was George Corley's age a substantial motivating reason for the [District's] discharge?" The jury responded in the affirmative. Thus, while the trial court instructed the jury in equivocal language that "[t]he use of

[14] Corley's counsel also emphasized during his closing argument the need for the jury to find that Corley's age was a "substantial motivating reason":

> "Ladies and gentlemen, this case is all about element [number] 5. Was George Corley's age a substantial motivating reason for the County Fire District's discharge of Chief Corley? Yes, it was."

salary as the basis for differentiating between employees when terminating employment *may be a factor* used to constitute age discrimination," the court's jury instructions, when considered as a whole,[15] properly conveyed to the jury that it was required to find that Corley's *age* was a substantial motivating reason in his termination. Corley counsel's argument and the special verdict form reinforced that the jury was required to make this determination. Thus, we are unpersuaded by the District's argument that the special instruction "made it unnecessary for the jury to find that age was a substantial motivating factor in the termination of Chief Corley's employment."

Accordingly, we conclude that it is not reasonably probable that the District would have obtained a more favorable result if the trial court had not given the special instruction pertaining to salary differential evidence. We therefore conclude that any such instructional error was harmless.

C. *There is substantial evidence to support the jury's award of damages based on its implicit finding that Corley would have been promoted but for the District's discrimination*

The District contends that there is insufficient evidence to support the jury's award of damages based on its implicit finding that Corley would have been promoted but for the District's discrimination.[16]

---

15    We are required to consider the jury instructions as a whole. (See *Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1052.)

16    Corley presented expert testimony as to his predicted loss of earnings, assuming that he had received a single promotion from division chief to assistant chief.

Other than contending that there is insufficient evidence to support the jury's implicit finding that Corley would have been promoted but for the District's discrimination, the District raises no challenge to the jury's calculation of damages.

23

" ' " 'The amount of damages . . . is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence.' " ' " (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 738 (*Atkins*).) " '[E]vidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure.' " (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 754.)

1.  *Governing law*

In *Atkins*, *supra*, 8 Cal.App.5th at p. 738, the Court of Appeal summarized the law governing an award of future economic damages:

> "A damage award must not be ' " 'speculative, remote, imaginary, contingent, or merely possible.' " ' [Citations.] Courts reviewing damages for the loss of future earnings have held such damages are recoverable ' " 'where the evidence makes reasonably certain their occurrence and extent.' " ' [Citations.] Indeed, '[d]amages must, in all cases, be reasonable.' [Citations.] Requiring the plaintiff to prove future economic losses are reasonably certain 'ensures that the jury's fixing of damages is not wholly, and thus impermissibly, speculative.' [Citations.]"

In *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 (*Bihun*), the Court of Appeal considered a defendant's contention that the jury's award of future loss of earnings was "based on impermissible speculation [plaintiff] would have been promoted to the next level . . . ." (*Id.* at p. 996.) The *Bihun* court rejected defendant's argument, reasoning:

> "The evidence showed [plaintiff] received nothing but excellent evaluations while employed by defendant and at the time the sexual harassment began she was rated 'ready now' for promotion from

---

Accordingly, we restrict our analysis to the question of whether there is substantial evidence to support the jury's implicit finding that Corley would have been promoted but for the District's discrimination.

24

level 5 to level 6.  It is not mere speculation that had she remained at AT&T her qualifications would have led to this promotion."  (*Ibid.*)

2. *Application*

The District contends that "the only evidence about whether Chief Corley would have been promoted was [Corley's] statement on cross-examination that he believed he would become fire chief."  The District reads the record far too narrowly.  In *Bihun*, the court concluded that evidence that the plaintiff had received excellent evaluations and was qualified for a promotion constituted evidence sufficient to support a finding that the plaintiff would have obtained a promotion that supported a damage award for future loss of earnings.  (*Bihun*, *supra*, 13 Cal.App.4th at p. 996.)

Corley presented considerable evidence from which the jury could find that it was "reasonably certain," that he would have attained a promotion from division chief to assistant chief but for the District's discrimination.  (*Atkins*, *supra*, 8 Cal.App.5th at p. 738.)  For example, Corley presented abundant evidence of his lengthy and decorated firefighting career, including his numerous awards, his high level certifications, his extensive supervisory experience and the praise that he had garnered from those who had worked with him, including his former supervisors with the District.  Corley also presented evidence that in 2010, he had received an overall rating of "exceeds standards" on his performance evaluation, and that his personnel file contained no evidence of

25

discipline. In addition, Corley presented evidence from which the jury could find that Trapp, who was appointed to the position of assistant chief in 2014, after Corley's termination, was less qualified for the position than Corley. This evidence is sufficient to support an award premised on the likelihood that Corley would have received a promotion if not for the unlawful termination, under *Bihun*.

We are not persuaded by the District's contention that the jury could not have reasonably found that Corley would have received a promotion but for the discrimination because whether he "would have [been] promoted depends on so many variables that it is impossible to determine his chances." For example, the District contends that whether Corley would have received a promotion would have depended on circumstances such as the applicant pool for the assistant chief position and whether Corley's interview for such a position went well. It was up to the jury to consider such variables and determine whether damages premised on a lack of promotion were "reasonably certain." (*Atkins*, *supra*, 8 Cal.App.5th at p. 738.) In light of the evidence discussed above, in considering these variables, the jury could have reasonably determined that Corley was likely to be promoted to assistant chief but for the District's discrimination.

Accordingly, we conclude that there is substantial evidence to support the jury's award of damages based on its implicit finding that Corley would have been promoted but for the District's discrimination.

D.  *The trial court did not abuse its discretion in applying a multiplier in awarding Corley attorney fees*

The District contends that the trial court erred in applying a multiplier in awarding Corley attorney fees.[17]

1.  *Governing law and standard of review*

" 'In determining [a] fee award [under section 12965, subdivision (b)[18]], the trial court must first determine "a 'lodestar' or 'touchstone' figure, which is the product of the number of hours worked by the attorneys and a reasonable fee per hour."  [Citations.] The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative " 'multiplier' " based on a variety of factors.  [Citations.]' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249.)

"We review attorney fee awards on an abuse of discretion standard.  'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." '  [Citation.]  'Fees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award.'  [Citation.]" (*Laffitte v. Robert Half Internat., Inc.* (2016) 1 Cal.5th 480, 488.)

---

17    Other than claiming that the trial court erred in awarding a multiplier, the District raises no other challenge to the trial court's attorney fee award.

18    The trial court awarded fees in this case pursuant to this statute, a provision contained in the Fair Employment and Housing Act (§ 12900 et seq.).

27

2. *The trial court's reasons for applying a multiplier*

The trial court awarded Corley a total of $853,443 in attorney fees, comprised of a lodestar amount of $568,962 and a multiplier of 1.5. The trial court stated its reasons for applying a multiplier in relevant part as follows:

> "A multiplier is appropriate for the contingency risk, delayed payment, and the skill of [Attorney] Carrillo in stepping in for [Attorney] Noel.[19] Corley requests a multiplier of 1.8, based on the public impact, quality of work, contingency in undertaking this case, and delay in obtaining payment[.]
>
> " . . . The District . . . challenges the need for a multiplier based on contingency, lost work, difficulty, or public interest.
>
> "However, as demonstrated by [Attorney] Noel and [Attorney] Carrillo imposing higher than market rates, a contingent risk and a delayed payment premium exist here. Indeed based, on the difference between the market rates identified above and the higher rates requested by counsel to work on this case,[20] a multiplier in the 1.4 to 1.5 range appears to have factored into the decision to work on this case. (E.g. 500/350 and 350/240.) Based on [Attorney] Carrillo's skilled performance in assuming lead counsel status when [Attorney] Noel was medically incapacitated, his focusing the jury's attention as the trial drew to a close, and the recalcitrance of the District to settle for a reasonable amount, despite numerous requests by counsel, using a rounded up multiplier of 1.5 appears warranted."

---

19     Corley was represented at trial by Attorneys Noel and Carrillo. During the trial, after 14 court days, Corley's lead counsel, Attorney Noel, became medically incapacitated. Attorney Carrillo continued to represent Corley through both the rendering of the jury's verdict, which occurred five court days later, and at a postverdict hearing on Corley's motion for attorney fees.

20     In another portion of its order, the court stated that Attorney Noel "declared her hourly rate was $500 based on accepting this case on a contingency matter," and that "a market rate of $400 is appropriate." With respect to Attorney Carrillo, the court noted, "[Attorney] Carrillo declares he agreed to associate with Noel to represent Corley for an hourly rate of $350 because payment would be deferred pending a favorable outcome for Corley," and that a market rate of approximately $250 was be appropriate.

3. *Application*

The District contends that none of the factors that the trial court cited justifies the application of a multiplier in this case. To begin with, the District claims that the trial court abused its discretion in applying a multiplier based on Attorney Carrillo's skill in representing Corley, because this factor was purportedly already reflected in the lodestar. It is well established that a trial court may award a multiplier based on an attorney's display of *exceptional* skill in a case, notwithstanding that an attorney's experience and skill are factors involved in determining an attorney's lodestar hourly rate. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1138 (*Ketchum*).) The District fails to present any argument with respect to the skill with which Attorney Carrillo represented Corley.

The District also contends that the trial court abused its discretion in applying a multiplier based on the delay in the payment of attorney fees to Corley's attorneys because this factor is one "common to many cases," which was partially compensated for by the availability of statutory attorney fees in this case. The Supreme Court has also expressly approved the use of this factor in justifying the award of a multiplier in a case involving statutory fees (*Ketchum*, *supra*, 24 Cal.4th at p. 1138), and the District fails to demonstrate how the trial court's use of this factor constitutes an abuse of discretion.

The District further contends that it was improper for the trial court to apply a multiplier based on the contingent nature of this case. In support of this argument, the District contends, "The United States Supreme Court has explained that this contingency

29

is already accounted for in the lodestar and thus, awarding a multiplier amounts to double billing. (*City of Burlington v. Dague* (1992) 505 U.S. 557, 562, 563 [(*Dague*)].)" The California Supreme Court expressly rejected the analysis of the *Dague* court on this point in *Ketchum*.[21] (See *Ketchum*, *supra*, 24 Cal.4th at p. 1138 [while discussing *Dague*, the *Ketchum* court stated, "Nor is it true that applying a fee enhancement will inevitably result in unfair double counting or a windfall to attorneys . . . . Under our precedents, the unadorned lodestar reflects the general local hourly rate for a fee-bearing case*; it does not include any compensation for contingent risk*, extraordinary skill, or any other factors a trial court may consider under [prior case law]" (italics altered)].)

Finally, the trial court did not abuse its discretion in determining that the "recalcitrance of the District to settle for a reasonable amount, despite numerous requests by counsel," supported the application of a multiplier. (See *Edgerton v. State Personnel Bd.* (2000) 83 Cal.App.4th 1350, 1363 ["the fact that [real party in interest] continued to oppose this litigation even though [plaintiff] offered to settle the case if [real party in interest] . . . supports application of the multiplier"].)

Accordingly, we conclude that the trial court did not abuse its discretion in applying a multiplier in awarding Corley attorney fees.

---

21    The *Ketchum* court noted, "We are not, of course, bound by the decision in *Dague*," and observed that *Dague* "involved issues of federal law and practice." (*Ketchum*, *supra*, 24 Cal.4th at p. 1137.)

30

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.